In the Matter of the ADOPTION OF SARA J., Joel J., and Morris J., Minor Children.

Nos. S–11301, S–11312.

Supreme Court of Alaska.

Nov. 10, 2005.

---

Eric D. Johnson, Association of Village Council Presidents, Bethel, for Appellant Native Village of Kasigluk. Mark Regan, Alaska Legal Services Corporation, Bethel, for Appellants Frank B., and Tonya B.

Mary Ann Lundquist, Assistant Attorney General, Fairbanks, and Gregg D. Renkes, Attorney General, Juneau, for Appellee State of Alaska, Department of Health and Social Services.

Michele Power, Angstman Law Office, Bethel, for Appellee Matilda W.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Matilda W., a caucasian living in Bethel, petitioned to adopt three sibling Native children. The superior court granted her petitions over the objections of the Native Village of Kasigluk and a Native couple who were interested in adopting the children. The Indian Child Welfare Act[1] (ICWA) establishes preferences for placing an Indian child within the child's extended family, with other members of the child's tribe, or with other Indian families.[2] The prevailing social

1. 25 U.S.C. § 1901 *et seq.* (1978).

2. 25 U.S.C. § 1915(a).

25 U.S.C. § 1915 provides in part:
(a) Adoptive placements; preferences
In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.
(b) Foster care or preadoptive placements; criteria; preferences
Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—
(i) a member of the Indian ·child's extended family;
(ii) a foster home licensed, approved, or specified by the Indian child's tribe;
(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.
(c) Tribal resolution for different order of preference; personal preference considered; anonymity in application of preferences
In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section. Where appropriate, the preference of the Indian child or parent shall be considered: *Provided,* That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences.
(d) Social and cultural standards applicable
The standards to. be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the par-

and cultural standards of the Indian community apply in meeting the preference requirements.[3] A court may deviate from these preferred placements only upon a showing of "good cause."[4]

Do the prevailing social and cultural standards also govern the good cause determination? We hold that they do not, but that they remain relevant if the good cause inquiry raises questions about the suitability of a statutorily preferred placement. They may also inform, but need not control, any determination of whether a child's special needs or other circumstances constitute good cause to deviate from the preferences.

Because the superior court's good cause findings in this case are supported by the evidence and do not implicate the suitability of a preferred placement, we affirm its determination that there is good cause to deviate from the preferences. We therefore affirm the decrees granting Matilda W.'s adoption petitions.

## II. FACTS AND PROCEEDINGS

Sara J., Joel J., and Morris J. are the biological children of Isabel B. and Roger J., who were members of the Native Village of Hooper Bay and the Native Village of Kasigluk, respectively.[5] The oldest child was born in 1994; the youngest was born in 1999. The parental rights of Isabel and Roger were terminated in January 2003.

Sara and Morris first entered state custody in 1997 and were placed with a relative in Kasigluk for a year and a half. They were briefly returned to their parents, but were removed soon after Joel's birth. Joel's medical problems required that he be close to a hospital, and he was placed in a Bethel home, and then with Matilda W., an unrelated caucasian woman living in Bethel. Sara and Morris later rejoined Joel when they were placed with Matilda after the Alaska Office of Children's Services (OCS), formerly known as the Alaska Division of Family and Youth

Services, received reports of harm while they were placed with a relative in Bethel.

OCS continued to seek a workable relative placement for the J. children, next placing them with Jake and Ruby B., the children's maternal uncle and aunt. After Joel was hospitalized, OCS removed him from that placement, placing him again with Matilda in January 2002. Sara and Morris joined him there a month later.

Frank and Tonya B., another maternal uncle and aunt, became interested in having the J. children placed with them, and sought a foster licensing in the summer of 2003. Matilda petitioned to adopt the three J. children in July 2003.

The Native Village of Kasigluk, as the tribe with the most significant contacts, intervened pursuant to Alaska Adoption Rule 12(a) and opposed Matilda's three adoption petitions. The superior court conducted a six-day trial on whether to grant Matilda's petitions. The superior court found good reason to deviate from ICWA placement preferences and granted Matilda's petitions. The superior court found that the children have special educational and behavioral needs that are best met by Matilda in Bethel, that the children's ability to attach would be irrevocably destroyed and severe damage would result if they were removed from Matilda's care, and that it was in the children's best interests to grant Matilda's adoption petitions. It also found that Matilda could adequately meet the children's cultural needs in Bethel and that the state had made active efforts to place the children in a long-term preferred placement. The superior court issued decrees of adoption for each child.

The Native Village of Kasigluk and Frank and Tonya B. appeal, arguing that the good cause determination under ICWA must be governed by the prevailing social and cultural standards of the Indian community and that the superior court's findings were unsupported by the evidence. The appellants filed a joint brief. We refer to them collectively as

ent or extended family members maintain social and cultural ties. . . .

3. 25 U.S.C. § 1915(d).

4. 25 U.S.C. § 1915(a).

5. Pseudonyms are used for the J. children, the parents, the adoptive mother, and all other family members.

the "tribe." The state and Matilda W. are appellees.

## III. DISCUSSION

### A. Standard of Review

We review a finding of good cause to deviate from ICWA preferences for abuse of discretion.[6] It would be an abuse of discretion for a superior court to consider improper factors or improperly weigh certain factors in making its determination.[7] Determining whether the superior court's findings comport with the requirements of ICWA raises a question of law that we decide de novo.[8] We review findings of fact for clear error.[9] A factual finding is clearly erroneous when we are "left with a definite and firm conviction that the trial court has made a mistake."[10]

### B. The Prevailing Social and Cultural Standards of the Relevant Indian Community Have Only Limited Application in Determining Whether Good Cause Exists To Depart from ICWA's Adoptive Preferences.

Congress enacted the Indian Child Welfare Act out of concern over the unwarranted break-up of Indian families caused by removal of children by state authorities and the placement of "an alarmingly high percentage of such children" with non-Indian foster and adoptive placements.[11] In an effort to reverse this trend, ICWA specifies preferred adoptive placements for Indian children.[12] Thus, 25 U.S.C. § 1915(a) provides:

In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

Furthermore, Congress intended in enacting ICWA that "white, middle-class standards" not be used in determining whether preferred placements are suitable.[13] Instead, § 1915(d) provides:

The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties.

The three preferred placements listed in § 1915(a) comprehensively rank the different possible family and Indian placements. Only for "good cause" may a state deviate from the three preferred placements, i.e., approve a placement with someone who is neither extended family nor Indian.[14] The "prevailing social and cultural standards of the Indian community" described in § 1915(d) unquestionably apply to disputes about the suitability of the preferred placements listed in § 1915(a). We will sometimes refer to these as "community," "prevailing," or "social and cultural" standards.

But these standards do not override or change the preference requirements of

---

6. *C.L. v. P.C.S.*, 17 P.3d 769, 772 (Alaska 2001); *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994).

7. *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000); *In re Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993).

8. *L.G.*, 14 P.3d at 950.

9. *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002).

10. *Id.; Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002).

11. 25 U.S.C. § 1901(4).

12. *In re Adoption of Bernard A.*, 77 P.3d 4, 9 (Alaska 2003) (recognizing that "placement pref-

erence[s] of the ICWA [are] meant to reverse a pattern of breaking up Indian families and to promote the stability of Indian families") (internal footnote omitted).

13. *See* H.R. REP. No. 95–1386, at 24 (1978), U.S.Code Cong. & Admin.News 1978 at 7546.

14. We recognize that if one parent is Native and the other is not, the Indian child's extended family may include non-Native members who might argue for preferred placement status under ICWA. Despite this possibility, for ease of discussion we use the term "preferred placement" to denote Native placements as specified by § 1915(a).

§ 1915. Under § 1915(d) the prevailing standards are to be used "in meeting the preference requirements," not to override them. This means that within a preference tier the prevailing standards are to be used in selecting a placement. But as the statute is structured, it appears that social and cultural standards taken alone cannot provide for a different order of preference. In other words, community standards notwithstanding, an extended family member entitled to first-tier preference under § 1915(a) will occupy a higher tier of preference than a no-nextended family member of the child's tribe entitled to a second-tier of preference under the same subsection. Of course community standards may be reflected in a tribal resolution setting a different order of preference under § 1915(d) and if this is done the new order of preference is legally established. Furthermore, the standards are to be used in determining the suitability or unsuitability of a prospective placement. They may, for example, support a conclusion that a higher-tier potential custodian is unsuitable, thus clearing the way for a lower-tier custodian.

■ The tribe's main contention on appeal is that these standards also apply to any dispute under § 1915(a) about whether good cause exists to deviate from those placement preferences. The tribe argues that the superior court erred by failing to consider the prevailing social and cultural standards of the Village of Kasigluk when it decided whether there was good cause to grant Matilda's petitions for adoption. In considering whether these standards apply to the good cause determination, we look to the statutory language, legislative history,[15] the interpreta-

tion given the statute by the Bureau of Indian Affairs (BIA), and relevant case law.[16]

Because we read most of these sources, particularly the text of the statute and the BIA's interpretation, to indicate that the prevailing social and cultural standards of the Indian community are not generally applicable to the good cause determination, we ultimately disagree with the tribe. Nonetheless, because ICWA's purpose and the BIA's interpretation make the prevailing social and cultural standards relevant to the good cause determination insofar as this determination may implicate the suitability of a statutorily preferred placement candidate, many of the tribe's concerns are minimized. Furthermore, the superior court may refer to the prevailing social and cultural standards of the Indian community in determining whether a child's special needs or other circumstances are sufficient to establish good cause to deviate from § 1915(a)'s placement preferences.

The plain language of § 1915 suggests that the prevailing social and cultural standards do not apply to the good cause determination. Subsection 1915(d) dictates that the prevailing Indian standards are "to be applied in meeting the preference requirements of this section."[17] Subsection 1915(a) mandates that these preferences be applied "in the absence of good cause to the contrary."[18]

The tribe, in arguing that ICWA's plain language requires application of the standards to the good cause determination, contends that "[t]he 'preference requirements' of § 1915 of the ICWA can be 'met' either by giving an adoptive preference to a priority

---

15. In *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32–37, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), the Supreme Court began its discussion of the meaning of the word "domicile" in ICWA with an extended discussion of legislative history. *See also id.* at 44–45, 109 S.Ct. 1597 ("It is clear from the very text of ICWA, not to mention its legislative history and the hearings that led to its enactment, that Congress was concerned with the rights of Indian families and Indian communities vis-à-vis state authorities."). We therefore consider relevant legislative history in deciding this case.

A majority of the Supreme Court, to discern Congress's intent with respect to a particular federal statute, continue to look either to the

"context" of the problem Congress was addressing, and "not just literal text," *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, ——, 125 S.Ct. 1453, 1462, 161 L.Ed.2d 316 (2005) (Breyer, J., concurring, joined by O'Connor, Souter, & Ginsberg, JJ.), or to traditional legislative history. *Id.* at 1463 (Stevens, J., concurring).

16. *John v. Baker*, 982 P.2d 738, 747 (Alaska 1999), *cert. denied*, 528 U.S. 1182, 120 S.Ct. 1221, 145 L.Ed.2d 1121 (2000).

17. 25 U.S.C. § 1915(d).

18. 25 U.S.C. § 1915(a).

placement, *or* by showing that there is 'good cause to the contrary.' " (Emphasis in original.) The tribe argues that the phrase "meeting the preference requirements" plainly includes the good cause inquiry and that we should not create an "exemption" from the prevailing social and cultural standards of the Indian community for the good cause determination.

But we cannot agree with the tribe and the concurring opinion that the phrase "meeting the preference requirements" in § 1915(d) plainly includes § 1915(a)'s good cause inquiry.[19] In our view, a court applies the "preference requirements" by determining the suitability of potential preferred placements using the prevailing social and cultural standards of the Indian community.

Although they are part of a common statutory scheme, inquiries into suitable preferred placements are separate from inquiries into good cause. It is not plain from the language of the statute that standards applicable to the issue of the suitability of preferred placements must necessarily also apply to the issue of good cause. Rather, accepted principles of statutory interpretation suggest that the opposite is true.

Congress specified in § 1915(d) that the prevailing social and cultural standards are the standards "to be applied in meeting the preference requirements," but did not specify that these standards be applied to the good cause inquiry. Its failure to do so suggests that it did not intend the standards to apply to the good cause inquiry. Had Congress intended the states to apply the prevailing Indian standards when determining whether there is good cause to deviate from the preferences, we think it would have expressed itself more clearly.[20] For example, § 1915(d) could have stated generally that the prevailing Indian standards apply to disputes under § 1915(a). Or it could have specified that they apply "in determining whether there is good cause." Instead, by dealing with non-Native placements in the good cause clause, Congress appears to have intended that questions of the need for non-Native placements be conceptually separate from disputes about whether a preferred placement is suitable.[21]

■ The tribe also argues that in interpreting statutes that protect the rights of Native Americans, this court must resolve any ambiguity in favor of Native Americans.[22] According to the BIA, Congress left the primary responsibility for interpreting ICWA to the courts deciding Indian child custody cases.[23] We have recognized that other authorities interpreting the same provisions may also be useful.[24] In dealing with statutes protecting the rights of Native Americans, "the standard principles of statutory construction do not have their usual force."[25] But this principle is not a license to disregard the clearly expressed intent of

**19.** *See* Op. at 1034.

**20.** One commentator who argues that the prevailing social and cultural standards ought to apply to the good cause inquiry has recognized that the language does not currently support this reading. *See* Note, *The Indian Child Welfare Act: Guiding the Determination of Good Cause to Depart From the Statutory Placement Preferences*, 70 Wash. L.Rev. 1151, 1172–73 (1995) ("Congress could clarify this by simply inserting the phrase 'and in determining good cause to the contrary' into § 1915(d).").

**21.** The concurrence suggests that this reasoning is circular. Op. at 1034–35. It argues that we start from the "premise that § 1915(a)'s good-cause requirement is not part of that provision's preference requirements"—a premise the concurrence disputes. *Id.* In our view, the plainest reading of the statute warrants that premise. That Congress failed to write the provision in such a way that made it clear that the good cause

determination was encompassed by § 1915(d) simply reinforces a conclusion already suggested by the text of the statute.

**22.** *See John v. Baker*, 982 P.2d 738, 752 (Alaska 1999), *cert. denied*, 528 U.S. 1182, 120 S.Ct. 1221, 145 L.Ed.2d 1121 (2000).

**23.** Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584 (Bureau of Indian Affairs Nov. 26, 1979).

**24.** *See, e.g., John*, 982 P.2d at 747 n. 33 (according BIA Guidelines "important but not controlling significance"); *In re Adoption of F.H.*, 851 P.2d 1361, 1364 (Alaska 1993) ("Although the Guidelines do not have binding effect, this court has looked to them for guidance.").

**25.** *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985).

Congress, nor does it "permit reliance on ambiguities that do not exist." [26] United States Supreme Court opinions interpreting statutes protecting the rights of Native Americans have not completely disregarded traditional precepts of statutory interpretation.[27]

A fair appraisal of §§ 1915(a) and (d) demonstrates a congressional intent to apply the prevailing social and cultural standards of the Indian community to determinations of suitability of potential preferred placements, but not to determinations of good cause to deviate from the preferences. ICWA's context points to the same conclusion.

The context of ICWA's enactment suggests that the prevailing social and cultural standards of the Indian community do not apply to the good cause determination. The House Report's analysis of section 5, later codified as § 1915(d), stated that "[a]ll too often, State public and private agencies, *in determining whether or not an Indian family is fit for foster care or adoptive placement of an Indian child,* apply a white, middle-class standard which, in many cases, forecloses placement with the Indian family." [28] The House Report also stated that "[d]iscriminatory standards have made it virtually impossible for most Indian couples *to qualify* as foster or adoptive parents, since they are based on middle-class values." [29] Congress was clearly worried about the application of white, middle-class values to suitability determinations. Because the good cause inquiry is distinct from the suitability inquiry for

preferred placement candidates, it falls outside the purview of Congress's intent for the prevailing social and cultural standards of the Indian community.

The tribe argues that the same context supports its proposed interpretation. Congress found that in placing Indian children, state courts and agencies have "failed to recognize the essential tribal relations of Indian people and the social and cultural standards prevailing in Indian communities and families." [30] Congress enacted ICWA in large measure to protect "the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for ... placement ... which will reflect the unique values of Indian culture." [31] The use of the prevailing social and cultural standards of the Indian community to determine the suitability of preferred placements furthers this end and addresses the specific concern voiced by Congress. We are not persuaded that applying the prevailing social and cultural standards of the Indian community to the good cause determination is necessary to advance ICWA's purposes.

Subsection 1915(a) "establish[es] a Federal policy that, where possible, an Indian child should remain in the Indian community, but is not to be read as precluding the placement of an Indian child with a non-Indian family." [32] But in cases contested by Indian communities, this could be precisely the effect of applying the communities' prevailing social and cultural standards to the good cause

**26.** *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986).

**27.** *Id.* at 506–07, 106 S.Ct. 2039 (reading the Termination Act to avoid a "contorted construction ... that conflicts with the central purpose and philosophy of the ... Act" and incongruity within the Act); *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 774, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985) ("[E]ven though legal ambiguities are resolved to the benefit of the Indians, courts cannot ignore plain language that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims.") (internal quotations omitted); *see also South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 348–49, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (examining historical context

of treaty, considering maxim that statutes ought not be read so as to render words redundant, and referring to analogous precedent in concluding that its reading of statute's plain language was "reasonable interpretation").

**28.** H.R. Rep No. 95–1386, at 24 (1978), U.S.Code Cong. & Admin.News 1978 at 7546 (emphasis added).

**29.** H.R.Rep. No. 95–1386, at 11, U.S.Code Cong. & Admin.News 1978 at 7533 (emphasis added).

**30.** 25 U.S.C. § 1901(5) (1978).

**31.** 25 U.S.C. § 1902 (1978).

**32.** H.R.Rep. No 95–1386, at 23, U.S.Code Cong. & Admin.News 1978 at 7546.

determination.[33] There was evidence here that Yup'ik standards dictate that Yup'ik children should invariably be raised by Yup'ik people. Applying the prevailing social and cultural standards to the good cause determination would effectively nullify the good cause exception in any case in which a tribe intervened under Alaska Adoption Rule 12(a) and offered equivalent evidence.[34] Such a result would be contrary to accepted precepts of statutory interpretation.

The tribe notes that almost every ICWA case involves a determination of good cause. This suggests to the tribe that applying non-Native standards to the good cause determination would create a loophole, eviscerating the protections of ICWA. The tribe's fear is misplaced. First, as outlined below, in determining whether good cause exists, "white, middle-class" standards may not be applied to reassess the suitability of a preferred placement. Second, under Alaska law the burden of showing good cause is on the party proposing placement outside the statutory preferences.[35] The BIA Guidelines for State Courts note that this allocation of the burden of proof is necessary "[s]ince Congress has established a clear preference for placements within the tribal culture." [36] (The BIA issued the Guidelines to provide nonbinding guidance to state courts interpreting ICWA.[37]) We are satisfied that these protections, together with the sound judgment of Alaska's trial courts, are sufficient to preserve ICWA's protections for Indian children and communities.

The tribe suggests that our cases are not inconsistent with applying the prevailing social and cultural standards of the Indian community to the good cause determination, but only reflect the lack of evidence of those standards. Thus, it contends that applying these standards is required in this case where, for the first time, the "tribal-standards mandate of § 1915(d) [is] directly at issue." The tribe's approach is problematic in several respects. First, the tribe offers no criterion by which to measure whether sufficient evidence of the prevailing social and cultural standards of the Indian community has been presented to determine good cause based on those standards. Second, it would create unnecessary uncertainty in litigation, as the state and potential non-Native placements could not be certain of the standard by which they had to prove good cause until the trial was well underway. This would prolong litigation in cases which require expeditious resolution.[38]

The tribe also argues that cases from other jurisdictions support its contention that the prevailing social and cultural standards of the Indian community apply to the good cause determination. In *Matter of Baby Boy Doe*,[39] the Idaho Supreme Court addressed this question. After quoting the BIA Guidelines regarding the good cause inquiry, the court stated that

> [i]n determining whether "good cause" existed, the trial court rejected the arguments by the adoptive parents' counsel that the child is old enough to request a preference; the child has extraordinary

33. The tribe argues that this argument is founded on the unwarranted assumption that all Indian communities will invariably oppose outside placements. But the argument merely recognizes that such an application of the social and cultural standards would give tribes power to veto a good cause determination in any case they choose to contest. We see little difference between granting an interested party a veto and complete nullification of the provision.

34. *See* 25 U.S.C. § 1911(c) (1978) ("In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.").

35. Alaska Adoption R. 11(f).

36. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,595 (Bureau of Indian Affairs Nov. 26, 1979).

37. *See id.* at 67,584.

38. *See* AS 47.05.065(5)(c) ("[I]t is important to provide for an expedited placement procedure to ensure that all children ... are placed in permanent homes expeditiously."); *S.H. v. State, DFYS*, 42 P.3d 1119, 1125 (Alaska 2002) ("The timeliness of a permanent stable placement for the children is paramount....").

39. *Matter of Baby Boy Doe*, 127 Idaho 452, 902 P.2d 477 (1995).

physical needs mitigating against the preferences; and that the proposed Indian placement (with the maternal aunt and uncle) is unsuitable. The trial court demonstrated knowledge of applicable legal standards in rejecting the adoptive parents' argument that negative social and economic conditions on the reservation constitute good cause. *The trial court correctly held that ICWA requires the court to apply the prevailing social and cultural standards of the Indian community.*[40]

In *Baby Boy Doe,* the non-Native adoptive parents mistakenly argued that negative social and economic conditions on the reservation constituted good cause for departing from the preferences.[41] But these conditions would be relevant, if at all, to the suitability of potential Native relative placements, and as such had to be viewed in light of the prevailing social and cultural standards of the Indian community. The court's language does not suggest that the child's ability to "request a preference" or the existence of "extraordinary physical needs" is governed by the prevailing social and cultural standards of the Indian community.[42]

The *Baby Boy Doe* court suggested that whether the psychological need for permanence could be satisfied by a relative placement should be analyzed in light of an Indian standard.[43] But the court ultimately affirmed the finding of good cause based on the biological mother's preference, the certainty of emotional trauma if the child was removed from the adoptive parents, and the likelihood of emotional trauma if the child encountered the father while living on the reservation.[44] In concluding that these considerations together constituted good cause under "the applicable legal standards," it did not discuss them with reference to the prevailing social and cultural standards of the Indian community.[45] The court instead approved of applying the prevailing social and cultural standards of the Indian community primarily to the determination of suitability.[46]

Similarly, *In re Jullian B.* reversed a finding of good cause because the trial court failed to consider several factors in light of the prevailing social and cultural standards of the Indian community.[47] The social worker in that case was concerned about the potential placement's "age, his inability to suggest a person who could care for the minor if he became incapacitated, his prior conviction for vehicular manslaughter of a child when he was driving under the influence, his failure to rehabilitate for many years ... [and] his health and his lack of support system...."[48] None of these concerns implicated special needs of the child. Instead, each of these factors was relevant to the suitability of the potential Native relative placement, and thus had to be considered in light of the prevailing social and cultural standards of the Indian community.[49] The court ultimately reversed on other grounds,[50] but never suggested that the prevailing social and cultural standards of the Indian community apply to anything determining the suitability of preferred placements.

These cases recognize that the prevailing social and cultural standards apply to determinations of the suitability of preferred placements even if the suitability determinations arise in the context of the good cause inquiry. We do not read these cases as

---

**40.** *Id.* at 487 (emphasis added).

**41.** *Id.*

**42.** *See id.*

**43.** *Id.* at 488 (citing *Matter of Custody of S.E.G.,* 521 N.W.2d 357, 364 (Minn.1994)). We discuss *S.E.G.* below.

**44.** *Id.*

**45.** *Id.* at 488–89.

**46.** *Id.*

**47.** *In re Jullian B.,* 82 Cal.App.4th 1337, 99 Cal. Rptr.2d 241, 250 (2000).

**48.** *Id.* at 249.

**49.** *Id.* at 250.

**50.** The trial court denied the preferred placement based on a statutory disqualification resulting from a forty-year-old criminal conviction. *Id.* at 249–50. The court held that no good cause to deviate from the preferred placement existed unless the appropriate agency requested waiver of the disqualification or explained why it did not, based on the facts of that case. *Id.* at 250.

requiring that the prevailing social and cultural standards of the Indian community apply to all aspects of the good cause inquiry.

Our conclusion that the prevailing social and cultural standards of the Indian community do not generally apply to the good cause determination is supported by the . BIA Guidelines, which suggest three factors to consider in determining good cause:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.[51]

As the Guidelines observe, the legislative history indicates that the "term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child."[52] This flexibility is not a license to impose non-Native standards when courts consider the suitability of statutorily preferred placement candidates. Rather, it is an authorization to take the child's special needs into account when determining whether good cause exists to place the child outside the statutory preferences despite the existence of an otherwise suitable home within the preferences.

Applying "white, middle-class" standards to the suitability inquiry as an aspect of the good cause determination could effectively read the preference requirements and the

prevailing social and cultural standards of the Indian community out of the statute. This would occur if courts, while determining whether there is good cause for deviating from the statutorily preferred placements, could apply white, middle-class standards to examine or reexamine the suitability of a Native or relative placement deemed suitable under prevailing Indian social and cultural standards. This is the very problem ICWA was enacted to eliminate. Our holding today respects the purposes of ICWA by preventing non-Native standards from being used to decide that a preferred placement is not suitable.

The qualifications required of expert witnesses in our ICWA cases reinforce this conclusion. In some parental rights termination cases, experts with specialized knowledge of the Native culture are needed because social workers without expertise are unable to distinguish between the prevailing standards of the Indian community and actual abuse and neglect.[53] But so long as issues of cultural bias are not implicated, experts need not have training in the cultural standards of the Indian community.[54] These rules reflect an implied judgment that while the suitability of a Native household must be viewed in light of the prevailing social and cultural standards of the Indian community, courts are not compelled to analyze a child's special needs according to those standards. Such needs would demonstrate good cause if, as the superior court found here, adequate facilities to address them were not available to the preferred placement but were available to the non-preferred placement.[55]

**51.** Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,594 (Bureau of Indian Affairs Nov. 26, 1979).

**52.** *Id.* at 67,584 (citing S.REP. No. 95–597, at 17 (1977)).

**53.** *L.G. v. State, Dep't of Health & Soc. Servs.,* 14 P.3d 946, 952–53 (Alaska 2000) ("[T]he primary reason for requiring qualified expert testimony in ICWA termination proceedings was to prevent courts from basing their decisions solely upon the testimony of social workers who possessed *neither* the specialized professional education *nor* the familiarity with Native culture necessary to distinguish between cultural variations in child-rearing practices and actual abuse or neglect.") (emphasis in original).

**54.** *Id.* at 953 (holding that "where there is clear evidence that a child faces a serious risk of physical neglect if she remains in her parent's care, a trial judge may terminate parental rights without hearing testimony from an expert in Native cultures").

**55.** *See* Guidelines for State Courts, 44 Fed.Reg. at 67,594 ("In a few cases a child may need highly specialized treatment services that are unavailable in the community where the families who meet the preference criteria live. Paragraph (ii) recommends that such considerations be considered as good cause to the contrary.").

In determining whether a child's special needs rise to the level that constitute good cause to deviate from the preferences, the superior court may consider the prevailing social and cultural standards of the Indian community. Courts should be sensitive to any differences in the circumstances that allow children to flourish in Native and non-Native communities. But courts need not ultimately apply the prevailing social and cultural standards of the Indian community in determining whether the resources available to an otherwise-suitable preferred placement are adequate to address the child's special needs.

The concurring opinion contends that the prevailing social and cultural standards of the Indian community directly apply to the good cause determination. This contention is grounded on a perception of the role of the placement preferences and the good cause determination fundamentally different from our own. The concurring opinion suggests that the good cause determination is a device for choosing between non-preferred placements and suitable preferred placements.[56] If this were indeed the role of the good cause inquiry, we would agree that the prevailing social and cultural standards of the Indian community must govern.

But although it is correct that the word "preference" generally connotes a choice between two options,[57] we read ICWA's structure and purpose to preclude choosing between preferred and non-preferred placements if the preferred placement is "suitable," as measured by the prevailing social and cultural standards of the Indian community. The existence of a suitable preferred placement precludes *any* consideration of a non-preferred placement unless good cause exists, for example, because another preference has been expressed by the child or the child's biological parents, or because the child has special needs that can-

not be met by an otherwise-suitable preferred placement.

The concurrence also contends that the court's interpretation of § 1915 creates an "unrealistic dichotomy" between placement decisions and good cause determinations.[58] It characterizes the suitability determination required for a preferred placement and the "special needs" assessment necessary for a good cause determination as "flip sides of the same coin."[59] But that is not how the words of the statute treat them. The statute expressly envisions "good cause" as an exception to the general rule of preferred placements. As noted above, the proponent of placing a child in a non-preferred placement bears the burden of demonstrating that the child's special needs require that placement. The concurrence is doubtless correct in saying that any placement decision involves examining more than "a potential placement's abstract ability to care for a hypothetical child."[60] But a good cause determination is nonetheless legally and analytically distinct from a placement decision. It requires extenuating circumstances beyond the typical considerations at issue in a placement decision.

In holding that the prevailing social and cultural standards of the Indian community apply to the good cause determination only when it implicates a preferred placement's suitability, we recognize our disagreement with a decision of the Minnesota Supreme Court. In *Matter of Custody of S.E.G.*, that court rejected a trial court's finding that the need for permanence was an extraordinary emotional need and that adoption was the only way to meet that need.[61] On appeal, the court held that evidence of a special need for permanence must be presented by qualified experts with knowledge of the Indian community, suggesting that "permanency is defined differently in Native American cultures."[62] The court thus seemingly integrated the prevailing social and cultural stan-

---

**56.** Op. at 1035.

**57.** *Id.*

**58.** Op. at 1037.

**59.** Op. at 1037.

**60.** *Id.*

**61.** *Matter of Custody of S.E.G.*, 521 N.W.2d 357, 364 (Minn.1994).

**62.** *Id.*

dards of the Indian community of § 1915(d) into the § 1915(a) good cause analysis while leaving open the possibility that the location of necessary treatment services would not fall under § 1915(d)'s purview.[63] Nevertheless, we believe that the words of the statute, the context of the legislation, and the BIA Guidelines support our holding.

### C. Substantial Evidence Supported the Superior Court's Findings.

The tribe argues that the superior court's findings were not supported by substantial evidence. Many of its arguments hinge on its contention, rejected above, that the superior court erred by not applying the prevailing social and cultural standards of the Indian community. The superior court was not required to apply those standards, but we still review the tribe's factual contentions.

### 1. The superior court did not err in finding that harm to the children from living outside the village was outweighed by the potential harm from being separated from Matilda.

■ The tribe asserts that the superior court erred in finding that the damage to the J. children from being separated from Matilda would outweigh the damage that severance from their Yup'ik heritage would cause the children. The tribe asserts that "the Yup'ik standard gives less weight to the short-term disruption that a removal from [Matilda's] home might cause." The tribe believes that this disruption is outweighed by the lack of a "compass and foundation in life" that would result from the children being separated "from the life blood of their culture," and that "the children will melt 'like butter' into the supportive environment of [their] home and village community." This is essentially an argument that the superior

court should have conducted a "best interests of the child" analysis using the prevailing Yup'ik standards. But the children's special needs do not implicate the determination of suitability for a preferred placement and need not be analyzed using the prevailing social and cultural standards of the Indian community. The evidence suggests that removing the children from Bethel and Matilda would cause them special harm.[64]

Morris attends counseling in Bethel. His counselor, Jennifer Cashion, testified that he would likely suffer some regressive behavior if he had to change clinicians before a new therapeutic relationship could be established. Dr. MacIan, a clinical psychologist acquainted with the children and their needs, testified that Morris needs structure. Cashion testified that Morris exhibits symptoms of post-traumatic stress syndrome, and Matilda and another witness testified to the devastating impact another move would have on him. Sara has been diagnosed with an unspecified adjustment disorder and meets criteria designated for emotionally disturbed children. Sara's former counselor expressed both short- and long-term concerns for Sara if she is moved. We also note that Matilda testified that Morris told her that he wanted to be adopted by her.

There was evidence of the dangers inherent in raising Indian children in non-Native households. Dr. Roll testified that Native children raised in non-Native homes are at risk of erosion of language skills, identity, and cultural confusion, identity diffusion, and identification with the aggressor. But Dr. MacIan testified that these concerns can be mitigated in this case by taking advantage of opportunities in Bethel to encourage a positive view of the children's culture through contact with the Yup'ik culture. As outlined below, Matilda has demonstrated a willing-

---

**63.** *Id.* at 364 & n. 7 (quoting Guidelines for State Courts, 44 Fed.Reg. at 67,594).

**64.** We note that despite its disagreement over what standard applies to the good cause determination, the *S.E.G.* court might reach the same result in this case. In *S.E.G.*, the finding of good cause was rejected because the children's special needs were not established by expert testimony from persons knowledgeable about Native culture. *S.E.G.*, 521 N.W.2d at 364. Here, the

children's needs were established through the testimony of Dr. MacIan, who has extensive experience studying and working with Native children, and Jennifer Cashion, whose eight years of experience as a counselor have exposed her to "significant contact with Native children." In addition, there was testimony that three of the social workers who worked on this case were Yup'iks.

**1030**

ness and ability to expose the children to Yup'ik culture.

In light of the evidence discussed above, we cannot say that the superior court erred in finding that the damage that would be caused by separation from Matilda implicated special emotional needs, and together with the children's behavioral and educational needs, constituted good cause to deviate from the preferences. Nor does the tribe argue that Matilda is ineligible to adopt the children under state law.

2. **The superior court did not err in finding that the children's special needs could be met in Bethel, but not in the village.**

▪ The tribe also disputes the superior court's finding that the children's behavioral and educational needs could be met better in Bethel by Matilda than in Chevak with Frank and Tonya B.

Expert testimony established that the J. children have special needs. Sara has been diagnosed with an unspecified adjustment disorder and falls under criteria designated for emotionally disturbed children. Morris has been diagnosed with static encephalopathy and fetal alcohol spectrum disorder (FASD). Joel has been diagnosed with static encephalopathy, is hyperactive, exhibits poor short-term memory, and suffers from developmental delays and behavioral problems. Both Morris and Joel qualify for special education. Morris was in counseling at the time of trial.

Jackson S., the tribe's expert witness on raising children with special needs in the village setting, testified that he relied upon his twenty-eight-year-old and sixteen-year-old sons, his grandchildren, his extended family, and various services and workshops outside his village to help raise his adopted daughter, diagnosed with fetal alcohol syndrome (FAS). Tonya B.'s familial support network is not so extensive, consisting of Frank B.'s three siblings and her niece. She also stated that she would depend on her fourteen-year-old daughter for help. Although Frank testified that there are "help-

ers and providers" in the village for children with FAS, he had only superficial familiarity with these services. And even if treatment were available in the village, there is no evidence that it would be as easily accessible as in Bethel.[65]

Neither did Tonya demonstrate a clear understanding of the J. children's needs. When asked what Morris's needs were, she responded, "Well, if he comes into our house ... that's when I'll find out what his needs are." She also assumed the J. children would be easier to handle now that they are older, stating that "they'll be, like, mostly on their own with my children."

Matilda presented evidence that Bethel is well-equipped to address the special needs of the children. Joel's teacher testified that Joel needs to be in special education programs, and would benefit from being taught by certified teachers. She expressed doubt that many preschool programs in villages were taught by certified teachers. Morris attends counseling in Bethel with his behavioral health clinician. But for village-based clients, wellness counselors with less training than Morris's current counselor provide the ongoing counseling. These wellness counselors sometimes do not live in the villages. There was evidence that if Morris had to change clinicians, there would likely be some regressive behavior before a new therapeutic relationship could be established. Sara also requires mental health services to meet her needs.

A home study of Matilda's home describes Bethel as having "a full range of health care, mental health care, educational, religious, communications, and social services." The children's teachers indicated that Joel and Morris's special education needs can be met by the Bethel school district. Morris's counselor's testimony suggests that Bethel also has the behavioral health care facilities necessary to meet the J. children's needs. A 2002 Catholic Social Services adoption home study noted Matilda's ability to meet the children's medical and emotional needs. Morris's current and Sara's former behavioral health clinician indicated that the children

---

**65.** *See Adoption of N.P.S.,* 868 P.2d 934, 938 (Alaska 1994).

have made gains in therapy and behavior directly related to Matilda's care. Morris's former teachers agreed.

Based on this evidence, the superior court did not clearly err in finding that the children's special needs could be met in Bethel, but not in the village.

### 3. The superior court did not err in finding that OCS made adequate efforts under ICWA to provide a statutorily preferred placement.

■ The tribe also argues that the superior court erred in finding that OCS made adequate efforts under ICWA to provide the children with a statutorily preferred placement. The tribe does not assert that this argument depends on the application of the prevailing social and cultural standards of the Indian community.

Four out of the eight placements for Morris and Sara during the six years since their removal from their parents have been with relatives.[66] OCS compiled a list of eighteen potential relative placements. It contacted the tribes thirty-two times, not including contacts with individual relatives and the biological parents. Ms. Short, the J. children's original OCS social worker, testified that she exhausted efforts to find relative placements before placing the children with a non-Native family. Ms. Weston–Smith, the OCS worker assigned to the case in April 2003, testified that the tribes were informed at all times that OCS was looking for permanent placement. She also testified that OCS was guided by prevailing Yup'ik social and cultural standards in its search for a suitable placement meeting the preference criteria.

The children's placement history also supports a finding that OCS made active efforts to find preferred placements. OCS initially placed Morris and Sara with a relative in Bethel but soon removed them after discovering that the relative had a history with child protective services. The children were then placed with relatives in Kasigluk for eighteen months before returning to their biological parents. After removal from their

biological parents' care, Joel's medical problems required him to live close to a hospital, and he was placed in a non-Native foster home. Morris and Sara were placed with relatives until reports of harm required their removal and eventual placement with Joel under Matilda's care.

There was evidence that while the children were in Matilda's care, OCS continued to make substantial efforts to find relative placements. OCS considered and rejected placements with both paternal and maternal grandparents because the biological parents and other family members with criminal histories were living in those households. OCS eventually placed the children with relatives Jake and Ruby B., but had to remove them when Joel had to be hospitalized and Ruby B. informed OCS that the J. children, together with five other children living with them, were too much work for her. Other relatives were also disqualified for placement based on either their own criminal history or the criminal history of an adult living in the home.

OCS asked Frank and Tonya B. to be a temporary placement in late 2000, but they declined, stating that it would be too much work. Sometime between January and August of 2001, OCS contacted them again to discuss permanent placement, but Tonya again stated they did not want the J. children. The tribe's contention that OCS's failure to initiate more contact with Frank and Tonya after being rebuffed twice shows a lack of adequate efforts under ICWA is unconvincing. In January 2002 OCS contacted the tribe and was informed by counsel that all relative and tribal placements had been exhausted.

Based on this evidence, the superior court did not clearly err in finding that OCS made active efforts to find a statutorily preferred placement for the children.

### 4. The superior court did not err in finding that Matilda could adequately meet the children's cultural needs in Bethel.

■ Finally, the tribe assigns error to the superior court's finding that Matilda

---

**66.** Although the record is unclear, it appears that at the most, one of Joel's placements has been in a relative home.

could adequately meet the J. children's cultural needs in Bethel. The tribe founds this argument on the opinion of its expert witnesses on Yup'ik culture. The tribe argues that "occasional contacts are not enough," and that "full immersion in the culture is essential to all aspects of a Yup'ik child's well-being." The tribe's standard of adequacy would never allow placement outside the tribe, no matter what the circumstances. The tribe's evidence on this point may be persuasive in establishing a different order for statutorily preferred placement options, where weight may be given to the tribe's preferences as expressed by resolution.[67] But because this aspect of the good cause inquiry does not implicate the suitability of a preferred placement option, it is not governed by the prevailing social and cultural standards of the Indian community. Here, the suitability of Matilda, a non-preferred placement, is governed by state law and state standards. The superior court was therefore not bound to accept the "uncontradicted evidence of Yup'ik village social and cultural standards" as the tribe argues.

The tribe offered Mark John's expert testimony about the transmission of Yup'ik cultural values. He testified that a child growing up in Bethel could learn Yup'ik culture and values with exposure to language and Yup'ik elders, and adult male Yup'ik role models for the boys. Sara is enrolled in Yup'ik immersion school and speaks Yup'ik better than many of her Yup'ik friends at school. Morris's school has Yup'ik classes two to three times a week and tries to incorporate Yup'ik culture into the curriculum. Matilda has spoken to a number of Yup'ik coworkers who are willing to serve as male role models for the boys, including their uncle.

John also testified that a non-Yup'ik family would have to make an extra effort, and would need a connection with Yup'ik families willing to help, including taking the children to fish camp. Matilda has contacted the Kasigluk Tribal Council about the best way to maintain the children's cultural awareness through cultural activities. Matilda has also evinced willingness to maintain contact between the J. children and their relatives. The children currently have both non-Native and Yup'ik friends. They regularly attended fish camp in the summer before trial, and Sara has gone berry-picking. They also participate in Yup'ik dance.

The parties presented conflicting expert testimony about whether the children's cultural needs could be met in Bethel. Dr. Roll testified that the children could experience several problems relating to cultural identity, including erosion of language skills, identity confusion, cultural diffusion, and identification with the aggressor. But Dr. Roll had neither visited Bethel nor examined the J. children. Dr. MacIan is a clinical psychologist familiar with Morris and Sara, the J. children's school, history, and home. Dr. MacIan testified that many problems with cultural identity arise when a child has had no contact with the non-dominant culture and then has to deal with negative stereotypes after realizing that he or she belongs to that group. Dr. MacIan testified that this was not a danger for the J. children, who understand that they are Yup'ik. The superior court evidently credited Dr. MacIan's testimony. Its determination of credibility between competing experts is a factual finding, which we review for clear error.[68] We are not "left with a definite and firm conviction that a mistake has been made" [69] by the trial court in crediting Dr. MacIan's testimony.

The tribe makes much of Matilda's testimony to the effect that the children cannot truly understand their culture under her tutelage and with limited opportunity to participate in village life. We interpret this to be merely a recognition that this will be a difficult process and that while she can provide some cultural opportunities, she cannot recreate the cultural experience of living in a Yup'ik village. But this does not mean that she will be unable to meet the children's

---

**67.** *See* 25 U.S.C. § 1915(c).

**68.** *Knutson v. Knutson*, 973 P.2d 596, 599–600 (Alaska 1999) ("It is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence.").

**69.** *Matter of J.W.*, 921 P.2d 604, 606 (Alaska 1996).

cultural needs, nor does it disqualify her altogether from adopting the children.

In *Adoption of N.P.S.*,[70] we held that good cause existed to deviate from ICWA's preferences despite cultural disadvantages when the non-preferred placement "is minimally capable of providing for [the child's] cultural needs."[71] Matilda is much better suited to meet the children's cultural needs than the placement challenged in *N.P.S.* There, we held that regular contact with extended family and time spent in the village was sufficient to "give [the child] an understanding of the lifestyle of the Yup'ik culture as well as promot[e] a positive image of himself as an Alaskan Native."[72] Matilda, in contrast, has demonstrated the ability to utilize a range of resources to introduce the children to their Yup'ik culture.

The superior court did not clearly err in finding that Matilda could adequately meet the children's cultural needs in Bethel.

## IV. CONCLUSION

For these reasons, we AFFIRM the superior court's finding that good cause existed to deviate from the statutory preferences and its decrees of adoption for the J. children.

BRYNER, Chief Justice, concurring.

BRYNER, Chief Justice, concurring.

I disagree with the opinion's reasoning and its conclusion that ICWA § 1915(d) applies only to the intra-tribal portions of § 1915(a)'s placement requirements. In my view, § 1915(d) required the superior court to use the Indian community's cultural and social values in deciding whether good cause existed for the children's adoptive placement in Matilda W.'s home. I would nonetheless reject the broad meaning of that provision advocated by the tribe. I do not read § 1915(d) to mean that courts considering non-preferred placements must recognize and enforce tribal values that disqualify anyone but an Indian custodian from adopting

an Indian child; nor do I read § 1915(d) as saying that courts are bound by expert testimony telling them how an Indian community's values should be applied to a given case. Because my review of the record persuades me that the superior court correctly applied ICWA's placement preference requirements as I understand them, did not clearly err in its factual findings, and did not abuse its discretion in finding good cause for a non-preferred placement, I concur in affirming the judgment.

ICWA's preference requirements are spelled out in § 1915(a). This provision describes three levels of "preference" and requires state courts to apply these preferences "[i]n any adoptive placement of an Indian child under State law" unless the court finds "good cause to the contrary":

In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.[1]

ICWA § 1915(d) then commands that, "in meeting the preference requirements of [§ 1915]," courts must use "the prevailing social and cultural standards of the Indian community in which the parent or extended family resides."[2] Today's opinion would read this command as being limited to adoptive placements in Indian homes. In my view this reading is untenable. On its face, § 1915(d) applies to all "preference requirements" set out in § 1915(a), including that subsection's unequivocal requirement that a *good-cause determination be made before deviating* from a preferred placement.

Today's opinion advances no sound basis in the text or congressional history of § 1915 for reading § 1915(d)'s phrase "preference requirements" as excluding the good-cause requirement set out in § 1915(a). The opinion finds its reading implicit in § 1915(d)'s

**70.** *Adoption of N.P.S.*, 868 P.2d 934 (Alaska 1994).

**71.** *Id.* at 938.

**72.** *Id.*

**1.** 25 U.S.C. § 1915(a).

**2.** 25 U.S.C. § 1915(d).

language specifying that an Indian community's standards must be used "in meeting the preference requirements" of subsection (a). Because this wording does not authorize Indian standards to "override" the preference requirements, the opinion reasons, subsection (d) only requires Indian standards to be used for selecting a placement "within a preference tier."[3] But this reasoning is circular because it posits its own conclusion: it assumes at the outset that § 1915(a)'s good-cause requirement fails to qualify as one of § 1915(a)'s "preference requirements." If we start from the textually more plausible assumption that the good-cause determination *is* an integral part of subsection (a)'s "preference requirements," then applying the good-cause test to override an otherwise available preferred placement would result in "meeting the preference requirements."

The opinion similarly posits that § 1915(d) applies only to Indian placements because the language of that provision explicitly refers to "preference requirements" but not to the requirement of "good cause."[4] The opinion views this supposed omission as suggesting that Congress "did not intend the standards to apply to the good cause inquiry."[5] But again, the opinion is circular because it starts from the flawed premise that § 1915(a)'s good-cause requirement is not part of that provision's preference requirements. The premise is flawed because § 1915(a) explicitly extends to "any adoptive placement," and the good-cause component of that provision is an integral part of its requirements in "any adoptive placement" involving a non-Indian home.

The opinion tries to distance § 1915(a)'s good-cause inquiry from its preference requirements by describing the good-cause inquiry as merely "part of a common statutory scheme."[6] Yet the link is far closer than that: the preferred placements and good-cause requirement are joined in a single sentence in § 1915(a); and, as described there, they function as inseparable, mutually dependent requirements for *any* adoptive placements. By making its three listed preferences mandatory unless the court finds good cause to the contrary, § 1915(a)'s plain language integrates the good-cause inquiry into any placement decision involving potential custodians from more than one preference tier.

The opinion also suggests that § 1915(a) suffers from textual ambiguity because it lists three "preferred placements," all of which are Indian placements, while omitting any reference to a fourth category for placements in a non-Indian home.[7] But this suggestion is unfounded. The word "preference" necessarily describes a choice between two possibilities, one of which is better than the other. Thus, in listing three placement "preferences," § 1915(a) describes three *preferred* choices in descending order of priority. Because each listed placement is a "preference," each necessarily implies the existence of a less desirable choice. And in context, the implied least-desirable alternative for the lowest listed statutory "preference"—the preference for "other Indian families"—is obviously non-Indian families, which could not have been listed as a "preferred placement," because it is a non-preferred, default placement.

Hence, § 1915(a) does all that it sets out to do: it lists all of ICWA's *preferred* placements. And its opening phrase makes the comprehensive scope of its preference requirements unmistakably clear by emphasizing that the listed preferences must be obeyed "[i]n *any* adoptive placement of an Indian child under State law"[8]—not just in a preferred placement to an Indian home. Thus, the statute's list of "preferences" excludes no "placements." The plain language of § 1915(a) unambiguously requires good cause to be found whenever a court chooses between placement in an "other Indian famil[y]," under § 1915(a)(3), and a non-Indian family. In specifying what "preference[s] shall be given," Congress omitted nothing

---

3. Op. at 1022.

4. Op. at 1022–23.

5. *Id.* at 1023.

6. *Id.* at 1022.

7. *Id.* at 1022–23.

8. 25 U.S.C. § 1915(a) (emphasis added).

from § 1915(a)'s text suggesting that issues of good cause should be decided differently when they involve potential placements with non-Indian families.[9] Given the absence of textual ambiguity, I see no justification for departing from § 1915's plain meaning; for as the court itself acknowledges, our powers of statutory interpretation do not "permit reliance on ambiguities that do not exist."[10]

The court's reliance on ICWA's congressional history strikes me as equally unpersuasive. It seems anomalous to venture that a Congress concerned with stopping an exodus of Indian children to non-Indian homes would seek to cure the problem by adopting a good-cause provision that allowed Indian values to govern Indian-home placements but left states free to continue using non-Indian values in deciding when to move Indian children into non-Indian homes. The interpretation of § 1915 adopted in today's opinion defeats Congress's goal by openly inviting courts to trump Indian community norms with "white, middle-class" norms whenever a non-Indian placement can be found.

The opinion attempts to repair this flaw in its own theory by shaping § 1915's straightforward language into an elaborate yet ill-defined construct: the opinion posits that ICWA contemplates a distinction between preferred-placement decisions and good-cause determinations. Preferred-placement decisions would consider only Indian placements and would require courts to use Indian community values in determining the "suitability" of potential Indian custodians; by contrast, good-cause decisions would consider only non-Indian placements occasioned by the lack of a suitable preferred Indian placement and would require courts to use white middle-class values in determining whether a child's "special needs" justified deviating

from the preferred-placement requirements by making a non-Indian placement. The opinion declares that this interpretation accurately reflects "an implied judgment that while the suitability of a Native household must be viewed in light of the prevailing social and cultural standards of the Indian community, courts are not compelled to analyze a child's special needs according to those standards."[11]

The opinion nonetheless concedes that, if literally applied, this interpretation "would create a loophole[ ] eviscerating the protections of ICWA."[12] As the court itself admits,

> Applying "white, middle-class" standards to the suitability inquiry as an aspect of the good cause determination could effectively read the preference requirements and the prevailing social and cultural standards of the Indian community out of the statute. This would occur if courts, while determining whether there is good cause for deviating from the statutorily preferred placements, could apply white, middle-class standards to examine or reexamine the suitability of a Native or relative placement deemed suitable under prevailing Indian social and cultural standards. This is the very problem ICWA was enacted to eliminate.[13]

To prevent Indian children from the very dangers that led Congress to enact ICWA, the opinion declares an exception to its own rule: after broadly professing that "[t]he existence of a suitable preferred placement precludes *any* consideration of a non-preferred placement unless good cause exists;"[14] it insists that "in determining whether good cause exists, 'white, middle-class' standards may not be applied to reassess the suitability of a preferred placement."[15]

---

9. Indeed, if extra-tribal placements were excluded from subsection (a)'s "preference requirements," there would be no textual basis in ICWA for concluding that the good-cause requirement in § 1915(a) would apply to any non-Indian placement, regardless of whether or not the court used prevailing Indian community standards under § 1915(d).

10. Op. at 1023 (quoting *South Carolina v. Catawba Indian Tribe*, Inc., 476 U.S. 498, 506, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986)).

11. Op. at 1027.

12. *Id.* at 1025.

13. *Id.* at 1027.

14. *Id.* at 1028.

**1036**

As far as I can see, there appears to be no textual or contextual support for this approach. In fact, it appears that before today's opinion no legislative body or legal authority ever conceived of giving ICWA § 1915 such a roundabout reading. To be sure, as the court notes, the congressional record does suggest that ICWA's drafters were concerned about the difficulty Indian couples encountered in attempting to qualify as foster and adoptive parents.[16] But this hardly supports the conclusion that these difficulties were ICWA's sole, or even its primary, concern. It surely does not justify reading § 1915(a)'s plain language requiring placement preferences to be honored "[i]n *any* adoptive placement of an Indian child" [17] as having been meant to cover only preliminary placement determinations involving licensing and basic qualifications. And it certainly cannot justify ignoring the far broader purposes set out in ICWA § 190, the Act's introductory statement of Congressional findings. Among other things, these findings state

> that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

> ... that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

> ... that the States, exercising their recognized jurisdiction over Indian child custody

proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.[18]

It is true that the BIA Guidelines do mention the need to consider issues of "special needs" in making good-cause decisions; [19] but nothing in the Guidelines suggests that "suitability" and "special needs" issues should be treated as mutually exclusive considerations relating to different kinds of placement decisions. To the contrary, the Guidelines mention both special needs and the availability of suitable Indian homes as factors to consider in making good-cause determinations. By referring to both criteria in discussing the determination of good cause, the Guidelines plainly indicate that both suitability and special needs play an integral role in determining the existence of good cause.[20] Conversely, ICWA § 1915 describes both suitability and special needs as factors to consider in selecting preferred placements.[21] Indeed, § 1915(b) makes special needs a *mandatory* criterion for certain preferred-placement determinations involving the suitability of foster care and preadoptive placements.[22] Read together, then, § 1915 and the BIA Guidelines establish that suitability and special needs *both* are legitimate factors to be considered in making decisions concerning placement preferences *and* good cause.

Common sense, if nothing else, dictates the same conclusion. As a practical matter, a child's special needs are an indispensable component of any decision concerning a potential custodian's suitability for a specific adoptive placement. For purposes of establishing suitability, a proposed adoptive parent's abilities and the adoptive child's needs

15.  *Id.* at 1025.

16.  *See* Op. at 1024 & n. 29.

17.  25 U.S.C. § 1915(a) (emphasis added).

18.  25 U.S.C. § 1901(3)-(5).

19.  Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584 (Bureau of Indian Affairs Nov. 26, 1979) at 67,594

(relevant provisions set out verbatim in Op. at 1027).

20.  *Id.*

21.  *See* § 1915(b) (establishing preferred-placement requirements for foster and pre-adoptive placements) (set out in full, Op. at 1019, n. 2).

22.  *See* § 1915(b)(iv).

are flip sides of the same coin: though not identical, they fit together, are inseparable, and must correspond. By reading ICWA as commanding suitability decisions for preferred placements that completely ignore special needs, today's opinion demands an artificially narrow suitability finding that could only examine a potential placement's abstract ability to care for a hypothetical child. The opinion is equally unrealistic in assuming that special needs can be considered as part of the good-cause determination without redeciding a previous determination of the preferred custodian's suitability.

Here, for example, it would seem utterly unrealistic to imagine that a meaningful evaluation of Frank and Tonya B.'s suitability to become adoptive parents for Sara, Morris, and Joel could be prepared without carefully examining the children's needs; and it seems equally unimaginable that a good-cause inquiry could avoid redetermining issues concerning Frank and Tonya B.'s suitability to become adoptive parents of these children if the inquiry ultimately concluded, as it did here, that Matilda was the only available adoptive custodian who was capable of meeting their needs.

Today's opinion confirms this point. The superior court's decision in this case understandably took a different approach to good cause than the one newly announced in today's opinion. The trial court viewed the basic question before it as being "whether [Matilda] is the best candidate—among the families deserving to be the children's adoptive family—to provide for the emotional and educational needs of the children." In other words, the superior court saw the good-cause inquiry as requiring it to find the most suit-able parents. Yet in affirming the trial court's ruling, today's opinion does not fault that court for deciding good cause by comparing the suitability of all the available adoptive placements. To the contrary, despite its repeated references to "special needs," what the opinion basically holds is that Matilda appears to be the only suitable parent for Sara, Morris, and Joel.

The opinion's unrealistic dichotomy between suitability and special needs is not its only practical problem. Its approach is also troubling because it will invite courts to completely bypass Indian community values in any adoptive placement decision involving a non-preferred placement. Using the opinion's approach, courts in such cases could routinely assume that all proposed Indian placements would be "suitable" in the abstract sense; courts could then move directly to the good-cause determination and, applying white-middle class values, find the non-Indian custodian to be the only adoptive placement actually suitable for the specific children at issue. After all, if suitability for parenting hypothetical children can be determined without considering special needs, then specific children will always have "special needs."

This is not what ICWA requires. Section 1915(a) applies to adoptive placements, not preadoptive placements or licensing decisions for future adoptive placements; it contemplates custodian-specific and child-specific consideration of suitability and special needs in making all preferred-placement decisions as well as in making all good-cause determinations. I would read § 1915(d) as applying to all aspects of adoptive placement decisions required under § 1915(a), including good-cause findings justifying a non-preferred placement. To this extent, I agree with the tribe's position on the meaning of § 1915(d)'s reference to § 1915(a)'s "preference requirements."

But I nevertheless disagree with the tribe as to the meaning of § 1915(d)'s reference to "prevailing social and cultural standards." Determining the meaning of this phrase poses a difficult problem: Congress undeniably enacted the preference requirements to ensure that Indian children could remain in the Indian community whenever community placement would serve their best interests, as viewed by that community's standards; but, at the same time, Congress also expressly recognized that these requirements are "not to be read as precluding the placement of an Indian child with a non-Indian family." [23]

23. *See* Op. at 1024 & n. 32.

As the opinion rightly points out, "[t]here was evidence here that Yup'ik standards dictate that Yup'ik children should invariably be raised by Yup'ik people." [24] In pressing this evidence, the tribe appears to assume that § 1915(d)'s reference to using the Indian community's values requires courts to accept an Indian community's conclusions dictating how its traditional values should apply to a particular placement—including its traditional view that its values always require a preferred placement.

I disagree with the tribe's assumption. So does today's opinion, of course. But unlike the opinion, I think that the problem can best be resolved by reading § 1915(d)'s reference to Indian community values to mean what Congress intended. Specifically, I would decline to read § 1915(d)'s reference to "prevailing social and cultural standards" as including community views that flatly preclude non-Native placements. As I read § 1915(d)'s directive, it requires courts to apply the everyday norms and values that the Indian community applies in raising its own children within its community; but it does not command blind acceptance of Indian community views that categorically disqualify all potential non-preferred placements. This interpretation comports with the context and purpose of ICWA, and seems reasonably necessary to avoid absurd and unintended consequences. For if individual Indian communities could automatically block non-preferred placements on the ground that community values categorically preclude cross-cultural placements, then § 1915(a)'s placement preferences would effectively become placement mandates.

Here, the tribe's nearly exclusive reliance on evidence suggesting that Yup'ik standards would always require a Yup'ik placement reflects a basic misunderstanding of the meaning of § 1915(d)'s directive to use the "prevailing social and cultural standards of the Indian community" when applying § 1915(a)'s preference requirements. The broad reading of § 1915(d) advocated by the tribe in this case conflicts with congressional intent to allow non-Native placement where good cause exists. More important, it also conflicts with the express language of § 1915(a), which uses preference requirements not as substitutes for the application of state law but as a way of assisting states in deciding upon the "placement of an Indian child *under State law*." [25]

As I see it, § 1915(d) seeks to take a pragmatic approach to the universal pitfalls of cultural bias. It does not substitute the Indian community's norms for the substantive requirements of state law; it does not override the judge's usual duty to independently decide issues of suitability, good cause, and best interests according to state law's substantive standards; and it does not bind the court to accept expert testimony telling it how to apply a community's standards to a particular case. Instead, the provision simply directs the court to take a hard look at issues of suitability and good cause through the lens of the Indian community's basic values—not so the community can override the court's choice of suitable placements, but simply to balance the scales more fairly toward Indian custody by ensuring that judges applying state law will use the Indian community's perspective instead of their own to realistically assess all issues relating to the child's—not the community's—best interests.

In this case, compelling evidence was presented to support a finding of good cause to deviate from the placement preference. The superior court also heard abundant evidence, including both lay and expert testimony, concerning prevailing Yup'ik cultural and social standards. In considering this evidence, the court rejected testimony that simply refused to accept any possibility that a non-preferred adoptive placement would ever be suitable under prevailing Yup'ik norms. The court also rejected the case-specific conclusions reached by the tribe's main expert witness, Dr. Samuel Roll; it declined to credit them because Dr. Roll had never actually worked in Alaska Native villages or with Alaska Native children and because the court found his conclusions unpersuasive in light of other testimony presented at trial and the court's own accumulated experience. But despite

---

24. *Id.* at 1024.

25. 25 U.S.C. § 1915(a) (emphasis added).

rejecting Dr. Roll's case-specific views, the court accepted and considered other important aspects of his testimony, emphasizing that it found Dr. Roll's theories and information to be generally credible, and only disagreed with his application of his knowledge to the case at hand.

The court also carefully considered and balanced all of the other evidence bearing on the issue of Yup'ik social and cultural standards. And with this evidence in mind, in a thoughtful and comprehensive decision spanning forty pages, the court thoroughly evaluated all relevant aspects of good cause, including the suitability of Frank and Tonya B. to become the children's adoptive parents, the availability of other suitable preferred placements, Matilda's suitability as an adoptive parent for the children, her ability to meet the children's special needs, and her ability to meet their Yup'ik cultural needs. The court ultimately found good cause to deviate from the placement preferences and concluded that a non-preferred placement would serve the children's best interests. The court essentially concluded that Matilda was the only available placement capable of providing a home for the children without subjecting them to a risk of serious physical and emotional harm; in stating its conclusion, it specifically found that the risk of harm from any other placement would be clearly unacceptable "in either the Western or Yup'ik tradition."

Based on my own understanding of ICWA's placement preference requirements, as explained above, I would conclude that the superior court's decision relied on a correct understanding of the applicable law. I agree with today's opinion in concluding that, on appeal, the tribe has not shown that any of the trial court's central factual findings are clearly erroneous or that the conclusions the trial court reached from those findings amount to an abuse of discretion. On this basis, despite disagreeing with the opinion's view of the law, I concur in affirming the superior court's judgment.