STOWERS, Justice.
I. INTRODUCTION
This is the second appeal in a case that began in July 2008 when the Alaska Office of Children's Services (OCS) assumed custody of four-month-old Dawn [1] from her parents.[2] Dawn was found to be a child in need of aid (CINA).[3] Dawn's parents were Alaska Natives and thus the protections and requirements of the Indian Child Welfare Act (ICWA) [4] applied to the CINA case.[5] One of ICWA's provisions establishes preferences for foster care and adoptive placement of an Indian child with a member of the child's extended family, with other members of the child's tribe, or with other Indian families.[6] Native Village of Tununak (the Tribe) intervened in Dawn's CINA case and submitted a list of potential placement options for Dawn, including Dawn's maternal grandmother, Elise, who lives in the village.[7] Throughout much of the case, the parents and Tribe agreed there was good cause not to place Dawn with an ICWA preferred placement, and Dawn was eventually placed with the Smiths, non-Native foster parents who live in Anchorage.[8]
The superior court terminated Dawn's parents' parental rights at a September 2011 trial, making Dawn eligible for adoption.[9] The Tribe asserted that, given the termination of parental rights, there was no longer good cause to deviate from ICWA's placement preferences and objected to Dawn's continued placement in Anchorage.[10] In November the Smiths filed a petition to adopt Dawn.[11] At no point in the case did Elise file an adoption petition in the superior court.
The superior court conducted a placement hearing following the Tribe's objection to placement with the Smiths.[12] Following testimony by a number of witnesses, including Elise,[13] the court found that there was continued good cause to deviate from ICWA's adoptive placement preferences and again approved Dawn's placement with the Smiths.[14] The court then granted the Smiths' adoption petition in March 2012.[15] Dawn was almost four years old, and had *167 lived with the Smiths for almost two and a half years.[16]
In separate appeals, the Tribe appealed both the superior court's order finding that there was good cause to deviate from ICWA's placement preferences and the adoption order.[17] We issued an order staying the adoption appeal while we considered the adoptive placement appeal.[18]
On June 21, 2018, we issued our decision in the first appeal that examined Dawn's adoptive placement with the Smiths.[19] We reversed the superior court's finding of good cause to deviate from ICWA's placement preferences.[20] Though we had held in previous cases that the preponderance of the evidence standard was the correct standard of proof, we were convinced by the Tribe's argument that the preponderance standard was inconsistent with Congress's intent in enacting ICWA, and that a higher standard of proof-proof by clear and convincing evidence-was required.[21] We overruled our prior cases and remanded the adoptive placement case to the superior court for it to take additional evidence and make its determination whether there was clear and convincing evidence of good cause to deviate from ICWA's adoptive placement preferences.[22] We continued our stay order of the adoption appeal.[23]
Four days after we issued our opinion in the adoptive placement appeal (Tununak I), the United States Supreme Court issued its opinion in Adoptive Couple v. Baby Girl (Baby Girl).[24] There, the Supreme Court held that ICWA "§ 1915(a)'s [placement] preferences are inapplicable in cases where no alternative party has formally sought to adopt the child. This is because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward."[25]
We asked the parties to provide supplemental briefing and oral argument on the effect of the Supreme Court's Baby Girl decision on the adoption appeal currently before us.[26] We now hold that because the United States Supreme Court's decisions on issues of federal law bind state courts' consideration of federal law issues-including the Indian Child Welfare Act-the decision in Baby Girl applies directly to the adoptive placement case on remand and to this adoption appeal. We discern no material factual differences between the Baby Girl case and this case, so we are unable to distinguish the holding in Baby Girl Because the Supreme Court's holding in Baby Girl is clear and not qualified in any material way, and because it is undisputed that Elise did not "formally [seek] to adopt" Dawn in the superior court, *168 we conclude that, as in Baby Girl, "there simply is no 'preference' to apply,] [as] no alternative party that is eligible to be preferred under § 1915(a) has come forward[,]" and therefore ICWA "$ 1915(a)'s [placement] preferences are inapplicable.[27] " We affirm the superior court's order granting the Smiths' petition to adopt Dawn and vacate our remand order in Tununak I requiring the superior court to conduct further adoptive placement proceedings. We do not otherwise disturb our decision in Tununalk I.
II. FACTS AND PROCEEDINGS
A. Facts
Dawn F. was born in Anchorage in March 2008.[28] When she was four months old OCS assumed emergency custody and placed her in foster care in Anchorage.[29] The Tribe formally intervened in Dawn's CINA case in August 2008 and submitted a list of potential foster placement options under Alaska Child in Need of Aid Rule 8(c)(7)[30] for Dawn, including placement with her maternal grandmother, Elise F., who lived in Tunu-nak.[31] Elise discussed foster placement at meetings with OCS in July and September 2008, but OCS ruled her out as a potential placement because an adult son living with her at the time had a barrier-crime for placement purposes.[32] OCS placed Dawn in a non-Native foster home to facilitate visitation with her mother, Jenn F., who lived in Anchorage.[33] In November 2008 the parties stipulated that there was good cause to deviate from ICWA's placement preferences, and in March 2009 the superior court found there was good cause to continue the deviation, as Jenn was progressing with her OCS case plan and it appeared she might be reunited with Dawn.[34] In August 2009 Elise contacted OCS to report that her son had moved out; she confirmed that she still sought foster placement.[35]
In October 2009 OCS placed Dawn with non-Native foster parents Kim and Harry Smith in Anchorage, and in December 2009 Elise visited Dawn.[36] Following this meeting, Elise did not call, write, or communicate with Dawn.[37] Also in December 2009 a representative from the Association of Village Council Presidents visited Elise's home in Tununak on OCS's behalf and noted potential hazards in the home that needed to be addressed before placement could occur.[38] These included unsecured guns, cleaning supplies, medicine, and general clutter in the area that Elise planned to use as Dawn's bedroom.[39] In February 2010 Elise assured OCS she would remedy these issues, and OCS asked Elise to arrange for a second home visit onee she made the proposed changes.[40]
*169 In May 2010 Elise attended a visit with Jenn and Dawn and told an OCS social worker that she thought Jenn would complete substance abuse treatment; Elise did not seek foster placement at that time and had not remedied the issues in her home.[41] OCS filed two petitions to terminate Jenn's parental rights: the first was denied in November 2010, and a second was filed in April 2011.[42] At a status conference in February 2011 Elise was present telephonically, and she questioned the court about whether Dawn would be returned to Jenn.[43] The court advised her in no uncertain terms that it was not safe for Dawn to return to Jenn's household given Jenn's continuing mental health issues and illegal drug use.[44] The superior court ultimately terminated Jenn's parental rights in September 2011.[45] Following termination the Tribe argued there was no longer good cause to deviate from ICWA's placement preferences, and a placement hearing was scheduled.[46]
The Smiths filed an adoption petition on November 8, 2011, and the petition was stayed pending the resolution of the ICWA placement hearing on November 14, 2011.[47]
B. Proceedings
1. The placement hearing and appeal
The superior court noted at the outset of the placement hearing that it would not consolidate the CINA placement case with the adoption case, but cautioned the Tribe that it would not get "two bites at the apple"; in other words, "if the Tribe los[t], it [wouldJu't get to contest placement in the adoption proceeding."[48] We explained in Tunwnak I that "[when the court declined to consolidate the two cases, it stated that the future adoption proceeding would be dependent on the placement ruling in the CINA case"[49] and that "denying the Tribe's objections to adoptive placement [effectively] ... clear[ed] the way for the Smiths to adopt Dawn." [50]
Elise testified at the hearing.[51] She had previously been an ICWA social worker and was aware of her ICWA rights.[52] When asked if she wanted to take care of Dawn just because the Tribe wanted her to she answered with an equivocal "[yles and no.[53] She clarified: "[It is my right to adopt or take my granddaughter and ... raise her as an Alaska Native ... because she is part of my flesh and blood and so that she [can] learn her values in Native culture and traditions and where she came from."[54] Elise also said that she had not been able to see Dawn very often due to the expense of travel; she did not call or write letters to Dawn because the child was too young to read or communicate; she knew Dawn did not know her at that point; and she understood Dawn would have to be gradually introduced to life in the village to prevent culture shock.[55] Elise testified that she wanted Dawn to be placed with her "from the beginning" and she recognized that "if [Dawn] had moved [in] with me when [Dawn] was [a] young infant, then it could have been easier because [Dawn] would have known [her] grandmother[,]" but at this point Dawn had been "raised by [Kim and Harry Smith]." Elise also indicated at this hearing that she had filed a petition to adopt Dawn, but the record contains no evidence that such a petition was ever filed, and no party has argued to the contrary.[56]
*170 In its decision on placement the superior court noted that Elise was 67 years old and would be 82 when Dawn turned 18.[57] The court found Elise's testimony on the question of whether she wanted to adopt Dawn "less than convincing" and pointed out that she had maintained almost no contact with Dawn and knew nothing of Dawn's life in Anchorage.[58] The court also found that Elise testified that she wanted to adopt Dawn because the Tribe wanted her to.[59] The court found that the Smiths had been "exceptional foster parents" to Dawn.[60] Ultimately, the court determined there was good cause to deviate from ICWA's placement preferences by a preponderance of the evidence in accordance with Alaska Adoption Rule 11(f).[61] The Tribe moved to stay the Smiths' adoption proceeding pending the Tribe's appeal of the placement ruling to our court, but this motion was denied.[62]
2. The adoption hearing and appeal
On March 6, 2012, the superior court held an adoption hearing and granted the Smiths' adoption petition.[63] At that hearing the court noted that, since the placement hearing, "[njo individual has come forward" and "Inlo names have been put forward of somebody who would be ICWA compliant under 1915(a) and the [Smiths] have been there for Dawn for ... these several years and the child's almost four." The court concluded it was in Dawn's best interest to be adopted that day by the Smiths, but cautioned that "the adoption [could] be reversed ... anything could happen including removal of the child" from the Smiths' care. Elise did not appear at the adoption hearing.
The Tribe appealed the adoption to our court. On November 29, 2012, we issued an order sua sponte staying the adoption appeal pending our decision in the related adoption placement appeal.[64]
3. Our decision in the placement appeal in Tununak I and the United States Supreme Court's decision in Baby Girl
We issued our decision in the placement appeal on June 21, 2013.[65] In that opinion we reversed and remanded the superior court's adoptive placement decision.[66] We concluded that ICWA requires a heightened clear and convincing evidence standard of proof be applied to the § 1915(a) good cause determination.[67] Because the superior court's placement decision was decided under a preponderance of the evidence standard, we remanded for the superior court to undertake a new good cause determination, consistent with a clear and convincing evidence standard, to decide whether deviation from the preferred placement preferences provided in ICWA §$ 1915(a) was appropriate.[68] We issued an order along with our decision in Tununak I that requested the parties to brief their positions on whether our stay of Dawn's adoption appeal should continue pending the superior court's proceedings on remand following Tununak I.[69]
The United States Supreme Court issued its decision in Adoptive Couple v. Baby Girl four days later; the Court held that ICWA "§ 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child. This is because there simply is no 'preference' to apply if no *171 alternative party that is eligible to be preferred under § 1915(a) has come forward." [70]
In Baby Girl, the child's biological father (Biological Father) and biological mother (Birth Mother) broke off their engagement after Birth Mother became pregnant but would not accommodate Biological Father's request to move up the wedding.[71] Biological Father had no meaningful contact with Birth Mother following the couple's separation and sent her a text message indicating that he wished to relinquish his parental rights.[72] Birth Mother decided to give the child up for adoption and selected a nonNative adoptive couple (Adoptive Couple) through a private adoption agency.[73]
Approximately four months after Baby Girl's birth, Adoptive Couple served Biological Father with notice of their pending adoption petition.[74] Biological Father signed the paperwork, stating he was not contesting the adoption.[75] He later testified that he assumed he was relinquishing parental rights to Birth Mother.[76] Biological Father contacted a lawyer a day after signing the papers and subsequently requested a stay of the adoption proceedings.[77] In those proceedings he sought custody of Baby Girl, took a paternity test, and participated in a four-day trial after which the South Carolina Family Court ultimately awarded him eusto-dy and denied Adoptive Couple's adoption petition.[78]
That decision was appealed to the South Carolina Supreme Court, and Biological Father participated in that appeal.[79] The South Carolina Supreme Court characterized his appeal as a "legal campaign to obtain custody" and affirmed the family court order.[80] The decision was appealed to the United States Supreme Court, and Biological Father again participated in that appeal.[81] At no point did Biological Father file a petition to adopt Baby Girl.[82]
The United States Supreme Court ultimately reversed the South Carolina Supreme Court, holding in part that ICWA "§ 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child."[83] The Court reasoned: "This is because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward." [84]
Because the Supreme Court's interpretation of ICWA § 1915(a) in Baby Girl called into doubt the application of § 1915(a)'s placement preferences on remand in Tunu-nak I-as no one but the Smiths sought to formally adopt Dawn-we issued an order directing the parties to brief the effect of Baby Girl on the present adoption appeal and granted oral argument in the matter.[85]
III. STANDARD OF REVIEW
"[The [United States] Supreme Court's decisions on issues of federal law, including issues arising under the Federal Constitution, bind the state courts' consider *172 ation of those issues,"[86] and we review those issues de novo.[87] Pure questions of law, including issues of statutory interpretation, invoke our "duty to 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy' " [88] using our independent judgment.[89]
IV. DISCUSSION
All parties agree that we must decide the Tribe's challenge on appeal to the Smiths' adoption of Dawn in light of the Supreme Court's decision in Baby Girl The State contends that "[blecause no one other than the Smiths formally sought to adopt Dawn, her adoption should be upheld under the controlling [Baby Girl] decision." The Smiths agree. The Tribe urges us to vacate the superior court's adoption decree and remand this matter for an adoptive placement determination based on our decision in Tu-nunak I that required the superior court to find, under a clear and convincing evidence standard, whether there is good cause to deviate from ICWA § 1915(a)'s placement preferences. The Tribe takes the position that: (1) Baby Girl is factually distinguishable and inapplicable to state-driven child protection cases; (2) to the extent Baby Girl does apply, it merely requires that a specific family be formally identified as desiring placement of the Native child and Elise satisfied that requirement in this case; and (8) the requirement is satisfied in Alaska as soon as a tribe intervenes in the case and makes formal CINA Rule 8(c)(7) disclosures.
Finally, the Tribe contends that, if we interpret Baby Girl to mean that ICWA's placement preferences are inapplicable until an alternative adoptive family files a competing adoption petition, this decision will have disastrous results for rural Alaska, placing the largest burden on Native families with the fewest legal and financial resources, and create a dangerous disincentive for OCS, as the agency will place Native children in the first available home, thereby neutering the protections that ICWA originally sought to provide to promote the preservation of the Indian family.
The Tribe's interpretation of Baby Girl, as echoed by the dissent, strains the plain wording of a clear, unequivocal, and unqualified decision on a matter of federal law as interpreted by the United States Supreme Court. For the reasons that follow, we conclude that we are required to apply the Supreme Court's bright-line interpretation of ICWA § 1915(a)'s placement preferences to bar from consideration as an adoptive placement an individual who has taken no formal step to adopt the child.
A. ICWA § 1915(a) and Baby Girl Do Not Distinguish A State-Initiated Child Custody Proceeding From A Voluntary Private Adoption.
ICWA § 1915(a)s placement preferences apply to "any adoptive placement of an Indian child under State law,"[90] and ICWA defines adoptive placements broadly as "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." [91] The federal statute does not distinguish between state-initiated child protection cases and voluntary adoptions. The Supreme Court in Baby Girl also did not carve out such a distinction. In Baby Girl, the Supreme Court held without qualification that § 1915(a), "which provides placement preferences for the adoption of Indian children, does not bar a non-Indian family like Adoptive Couple from adopting an Indian child when no other eligible candidates have sought to adopt the child." [92] The Court emphasized that the "seope" of *173 § 1915(a) has a "critical limitation," namely, that " § 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child."[93] The Court reiterated, "This is because there simply is no 'preference' to apply if no alternative party that is eligible to be preferred under § 1915(a) has come forward."[94] To make its rationale perfectly clear, the Court again explained that, because Adoptive Coun-ple was the only family that "sought to adopt Baby Girl," $ 1915(a)'s "rebuttable adoption preferences [did not] apply [because] no alternative party ... formally sought to adopt the child." [95] As a policy matter, the Court broadly concluded that while ICWA "was enacted to help preserve the cultural identity and heritage of Indian tribes," to require a placement preference determination for a party who did not seek to adopt "would put certain vulnerable children at a great disadvantage solely because an ancestor-even a remote one-was an Indian."[96] The Court cautioned that such a result may cause "prospective adoptive parents [to] ... pause before adopting any child who might possibly qualify as an Indian under the ICWA." [97]
The dissent characterizes these statements by the United States Supreme Court interpreting § 1915(a) as dicta addressing the South Carolina Supreme Court's suggestion that if it had terminated Biological Father's rights, § 1915(a)'s preferences would have applied. But Baby Girl explained, clarified, and decided that § 1915(a) did not apply where no alternative party sought to adopt the Indian child, as was the case of Biological Father. When discussing the distinction between a holding and dictum, the Supreme Court has directed that "[when an opinion issues for the Court, it is not only the result[,] but also those portions of the opinion necessary to that result by which we are bound." [98] We are likewise bound by the Supreme Court's holding concerning § 1915(a); it was necessary to the Supreme Court's reversal of the judgment of the South Carolina Supreme Court and its remand of the case for further proceedings.[99] In those *174 further proceedings, it was clear to the South Carolina Supreme Court that § 1915(a)'s re-buttable adoption preferences did not apply to Biological Father, and the South Carolina court did not apply them. As the South Carolina Supreme Court stated on remand:
The [United States] Supreme Court has articulated the federal standard, and its application to this case is clear: ICWA does not authorize [Biological] Father's retention of custody. Therefore, we reject [Biological] Father's argument that 1915(a)'s placement preferences could be an alternative basis for denying the Adoptive Couple's adoption petition. The Supreme Court majority opinion unegquiv-ocally states [ ] [that] "§ 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child.". ... As the opinion suggests, at the time Adoptive Couple sought to institute adoption proceedings, they were the only party interested in adopting [Baby Girl]. Because no other party has sought adoptive placement in this action, § 1915 has mo application in concluding this matter .... [100]
The Supreme Court's federal standard is now clear, and consequently § 1915(a)s preferences will not apply in this case.
The dissent asserts that Baby Girl is factually distinguishable because "[rJather than a termination of parental rights through a private adoption arranged by a non-Indian parent after an Indian parent abandoned the child, this was a state-sponsored parental rights termination and a state-sponsored adoptive placement clearly subject to ICWA." The Supreme Court previously has explicitly discussed distinctions between voluntary and non-voluntary relinquishments of parental rights in the context of ICWA; it did not do so in Baby Girl. In Mississippi Band of Choctaw Indians v. Holyfield (Holy-field ), the Court noted that while the focus of Congressional testimony on ICWA was "on the harm to Indian parents and their children who were involuntarily separated by decisions of local welfare authorities, there was also considerable emphasis on the impact on the tribes themselves [from] the massive removal of their children" [101] outside of this context.[102] The Holyfield decision involved the voluntary adoption of twin babies."[103] *175 The Court concluded that ICWA still applied to such a situation because "[t]ribal jurisdiction under § 1911(a) was not meant to be defeated by the actions of individual members of the tribe,"[104] and congressional intent clearly indicated that an individual Indian could not defeat ICWA's jurisdictional scheme by voluntary action.[105]
In Holyfield, the Court adopted and applied its broad-sweeping interpretation of ICWA to all types of parental rights relinquishment cases, including those arising out of a parent's voluntary action. If in Baby Girl the Court had intended to limit its holding to voluntary adoptions, it certainly could have articulated such a restriction. But no such limiting language appears in the Court's opinion in Baby Girl. Because the Court did not limit its holding in Baby Girl to voluntary adoptions, we reject the Tribe's and the dissent's attempt to factually distinguish Baby Girl from the case before us where the adoption resulted from state-initiated child protective proceedings.
B. Elise Did Not Formally Seek To Adopt Dawn.
We are "not bound by decisions of federal courts other than the United States Supreme Court on questions of federal law." [106] But in cases where the Supreme Court has decided a question of federal law that is directly applicable to and binding on the case we are to decide, we "owe obedience to the decisions of the Supreme Court of the United States ... and a judgment of the Supreme Court provides the rule to be followed ... until the Supreme Court sees fit to reexamine it." [107]
After Dawn was placed in emergency foster care, the Tribe early on provided Elise's name to OCS as a potential placement option in its CINA Rule 8(c)(7) disclosures.[108] Elise discussed her initial interest in being a placement with OCS, but she was ruled out at that time because an adult son living with her had a barrier-crime.[109] Dawn was placed with non-Native foster parents in Anchorage so that she could be closer to her mother while Jenn completed treatment, and the parties stipulated that there was good cause to deviate from ICWA's placement preferences during this period while Jenn worked toward reunification with Dawn.[110] In August 2009 Elise contacted OCS to report that her son had moved out; she confirmed that she still sought placement, but in December 2009 a representative from the Association of Village Council Presidents visited Elise's home in Tununak on OCS's behalf and noted potential hazards in the home that needed to be addressed before placement could oceur.[111] Elise assured OCS she would remedy these issues.[112] During this period Jenn was working toward reunification with Dawn,[113] and Elise understandably wished to support her daughter in that endeavor.
The critical piece, however, is Elise's failure to formally assert her intent to adopt Dawn as OCS moved toward terminating Jenn's parental rights. The superior court denied OCS's first petition to terminate parental rights in November 2010, and a second petition was filed in April 2011 that ultimately resulted in termination in September 2011. At a status conference in February 2011 the superior court advised Elise that placement with Jenn was not a viable option due to *176 Jenn's continued mental health and drug issues. And when the Smiths filed a formal petition to adopt Dawn on November 8, 2011, Elise did not file a competing adoption petition or any other formal request that might serve as a proxy for such a petition.[114] In other words, knowing that the Smiths had the only legally viable request for adoption before the court at that time, Elise did not file a competing request to be considered an adoptive parent for Dawn prior to the placement hearing.
Elise did appear at the November 14, 2011 placement hearing and testified that she wanted to adopt Dawn.[115] She also testified that she had filed a formal adoption petition herself in Bethel. From the record developed by the parties both in the superior court and in this court, there is no indication that Elise filed an adoption petition or otherwise filed any formal court document demonstrating her intent to adopt Dawn. In its briefing to us the Tribe conceded that no court petition was filed. The superior court found Elise's testimony on her desire to adopt "less than convincing," observing that Elise also said that she wanted to adopt Dawn because the Tribe wanted her to and pointing out that she had maintained almost no contact with Dawn and knew nothing of Dawn's life in Anchorage. The superior court made this credibility determination and our role as the reviewing court is not to reweigh the evidence on this point, but instead to "review a trial court's decision in light of the evidence presented to that court." [116]
In Baby Girl, Biological Father displayed a much higher level of involvement, but the Supreme Court nonetheless found his efforts insufficient. Biological Father requested a stay of the adoption proceedings after learning of Adoptive Couple's pending request and sought custody of Baby Girl.[117] He participated in a trial in the South Carolina Family Court and was awarded custody,[118] had that custody order affirmed by the South Carolina Supreme Court,[119] and participated in the appeal before the United States Supreme Court. Notwithstanding this active participation by Biological Father at every level of the state and federal litigation, the Supreme Court still found that "he did not seek to adopt Baby Girl; instead, he argued that his parental rights should not be terminated in the first place." [120] In other words, because Biological Father did not "formally [seek] to adopt" Baby Girl, the Supreme Court held that he could not be an ICWA preferred placement-he was not an "alternative party" that triggered § 1915(a)'s adoptive preferences.[121]
Applying the Supreme Court's controlling precedent to the facts before us, it is clear that this is also a case where "there simply is no 'preference' to apply [as] no alternative party that is eligible to be preferred under § 1915(a) has come forward"[122] to adopt Dawn. Because the Smiths were the only family that, in the words of the Supreme Court, "formally sought to adopt" Dawn, § 1915(a)'s "rebuttable adoption preferences [do not] apply [because] no alternative party has formally sought to adopt [this] child."[123] In short, we are bound by Baby Girl's interpretation of this subsection of ICWA, and cannot ignore the Supreme Court's clear, unqualified ruling on a matter of federal Indian law.
C. Alaska CINA Rule 8(c)(7) Disclosures Are Not Analogous To Requiring An Individual To Formally Seek To Adopt A Child.
We are likewise not persuaded by the Tribe's argument that Elise's contact infor *177 mation on the Tribe's CINA Rule 8(c)(7) disclosure in the underlying CINA case amounts to a formal adoption request. Rule S(c)(7) directs that a tribe shall "without awaiting a discovery request, provide to other parties ... names and contact information for extended family of the child, a list of potential placements under ... § 1915, and a summary of any tribal services or tribal court actions involving the family." These initial disclosures must be made within 45 days of the order granting intervention.[124]
A tribe's production of contact information for possible placements is neither equivalent nor analogous to a formal adoption petition. Rule 8(c)(7) is a discovery procedure; it requires disclosure of potential placement options for OCS to consider. A Rule 8(c)(7) disclosure was filed by the Tribe; it does not in any way represent a clear expression by Elise (or anyone else) of a formal intent to adopt the child. An adoption petition, on the other hand, is the legally "formal" way for a person to express a readiness and willingness to adopt a child. In Baby Girl, the Supreme Court envisioned a bright-line test: in order to qualify for ICWA § 1915(a)'s adoptive placement preference, one must first "formally seek" to adopt the child by filing a petition for adoption.[125] If Biological Father did not meet this bright-line standard, notwithstanding his significant involvement at every level of the Baby Girl case, the Tribe's tender of Elise's contact information shortly after the Tribe's intervention in this case cannot meet the standard of "formally seeking" to adopt.
D. The Tribe's Policy Considerations
Finally, the Tribe argues that if we interpret Baby Girl to hold that ICWA's placement preferences are inapplicable until an alternative Native adoptive family member files a competing adoption petition, this decision will place a difficult burden on Native families, which have the fewest legal and financial resources, and create a dangerous incentive for OCS to place Native children in the first available home "except in the rare case when a Native family files its own adoption petition." The dissent echoes the Tribe's concerns, noting that "at least one state practice guide" does not read Baby Girl to mean an adoption petition must be filed; rather, all the practice guide cautions is that the adoptive candidate "formally" assert his or her intent to adopt the child and take "proper steps" to convey these intentions to the court.[126]
But the dissent misses the point of the practice guide. The practice guide concludes that "[flor practitioners representing a parent of an Indian child who wants assurances that his or her child will be placed with another family or tribal member if adoption is needed, the lesson is clear: identify early on any family members, relatives, or tribal members who are willing and desirous of custody and take proper steps to formally convey their intentions to the court in this regard." [127] As we have explained, we read Baby Girl to mean that filing a petition for adoption is "formally" asserting an intent to adopt using the "proper steps." And while we do not disregard the Tribe's policy concerns, neither may we disregard the holding of the Supreme Court on this matter of federal law.
Having said this, we urge tribes and OCS to enable and assist tribal members to seek placement early in CINA and voluntary adoption cases, accompanied by a formal adoption petition onee it appears that OCS's goal for the child is adoption. The Alaska Court System, attorneys representing tribes in Alaska, the CINA bar, the probate bar, and others will work to develop appropriate adoption forms and online information and instructions to assist tribes and potential adoptive parents in navigating this requirement.
We also stress that OCS remains bound to comply with § 1915(a)'s adoptive placement preferences for "(1) a member of the child's extended family; (2) other members of the *178 Indian child's tribe; or (8) other Indian families," And our decision in Tununal I directs that "OCS must prove by clear and convine-ing evidence that there is good cause to deviate from ICWA § 1915(a)'s adoptive placement preferences." [128] Implicit in this holding is the understanding that before the court entertains argument that there is good cause to deviate from § 1915(a)'s preferred placements, it must searchingly inquire about the existence of, and OCS's efforts to comply with achieving, suitable § 1915(a) preferred placements. Contrary to the dissent's suggestion, today's decision has no bearing on OCS's duty to comply with the express purpose of ICWA "to promote the stability and security of Indian tribes and families." [129] We anticipate that our decisions in Tununak I and today will highlight the importance of OCS identifying early in a CINA case all potential preferred adoptive placements, and the importance of a person claiming preferred placement filing a petition for adoption, in order to effectuate Congress's intent "to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society," [130]
v. CONCLUSION
Because we are bound to follow the United State Supreme Court's decision in Baby Girl, and because no one but the Smiths formally sought to adopt Dawn, we AFFIRM the superior court's grant of the adoption and VACATE Tununak I's prior order for a renewed good cause hearing in the underlying placement matter. The remainder of our opinion in Tununak I is unaffected by our decision today.
WINFREE, Justice, dissenting.

. We use pseudonyms to protect the privacy of the parties involved.

. Native Vill. of Tununak v. State, Dep't of Health & Social Servs., Office of Children's Servs., 303 P.3d 431, 433 (Alaska 2013) (Tununak I ).

. Id.

. 25 U.S.C. §§ 1901-1963 (2012).

. Tununak I, 303 P.3d at 433.

. 25 U.S.C. § 1915(a).

. Tununak I, 303 P.3d at 433.

. Id. at 434-35.

. Id. at 435.

. Id.

. Id.

. Id. at 435-39.

. Id. at 437-38.

. Id. at 439-40.

. Id. at 440.

, Id. at 434, 440.

. Id. at 440 n. 10.

. Id.; see also Native Vill. of Tununak v. State, OCS, et al., No. S-14670 (Alaska Supreme Court Order, Nov. 29, 2012) (staying sua sponte the adoption appeal pending the resolution of the adoption placement appeal).

. Tununak I, 303 P.3d at 431.

. Id. at 453.

. Id. at 446-49.

. Id. at 453.

. Native Vill. of Tununak v. State, OCS, et al., No. S-14670 (Alaska Supreme Court Order, Nov. 29, 2012); Native Vill. of Tununak v. State, OCS, et al., No. S-14670 (Alaska Supreme Court Order, June 21, 2013) (ordering briefing on whether the stay of the adoption appeal should continue following the court's issuance of its opinion in the adoption placement appeal).

, - U.S. -, 133 S.Ct. 2552, 186 L.Ed.2d 729 (2013).

. Id. at 2564. The dissent argues that this portion of the opinion was dicta. We disagree. While "statements of a legal rule set forth in a judicial opinion do not always divide neatly into 'holdings' and 'dicta,' " Parents Involved in Cnty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 831, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) (Breyer, J., dissenting), in this case, the Court's Baby Girl opinion is divided into distinct sections considering three discrete subdivisions of ICWA: §§ 1912(f), 1912(d), and 1915(a). See Baby Girl, 133 S.Ct. at 2557. The Court's discussion of § 1915(a) is succinct and its holding unequivocal, id. at 2564-65, and we apply it to the facts of the present appeal.

. Native Vill, of Tununak v. State, OCS, et al., No. S-14670 (Alaska Supreme Court Order, Oct. 7, 2013) (ordering briefing and oral argument on the effect of Baby Girl on the adoption case).

. Baby Girl, 133 S.Ct. at 2564.

. Tununak I, 303 P.3d at 433.

. Id.

. That rule states:
Except to the extent otherwise directed by order or rule, [a tribe that has intervened in the proceedings] shall, without awaiting a discovery request, provide to other parties the following information, excluding any privileged material: ....
... names and contact information for extended family of the child, a list of potential placements under ... § 1915, and a summary of any tribal services or tribal court actions involving the family.
Unless otherwise directed by the court, these disclosures shall be made within 45 days of the date of service of the petition for adjudication, or for tribes, the date of the order granting intervention. A party shall make its initial disclosures based on the information then reasonably available to it and is not excused from making its disclosures because it has not fully completed its investigation of the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures.

. Tununak I, 303 P.3d at 433.

. Id. at 433-34.

. Id. at 434.

. Id.

. Id.

. Id.

. Id.

. Id.

. Id.

. Id.

. Id.

. Id. at 434-35.

. Id. at 435.

. Id.

. Id.

. Id.

. Id.

. Id. at 443.

. Id.

. Id. at 444.

. Id. at 437-38.

. Id.

. Id. at 438.

. Id. (internal quotation marks omitted).

. Id.

. In its briefing to us the Tribe conceded that no court petition was filed.

. Id. at 439.

. Id.

. Id.

. Id.

. Id. at 439-40.

. Id. at 440.

. Id.

. Native Vill. of Tununak v. State, OCS, et al., No. S-14670 (Alaska Supreme Court Order, Nov. 29, 2012).

. Tununak I, 303 P.3d at 431.

. Id. at 453.

. Id.

, Id. at 452-53.

. Native Vill. of Tununak v. State, OCS, et al., No. S-14670 (Alaska Supreme Court Order, June 21, 2013).

. Baby Girl, 133 S.Ct. 2552, 2564 (2013).

. Id. at 2558.

. Id.

. Id.

. Id.

. Id.

. Id.

. Id. at 2558-59.

. Id. at 2559; Adoptive Couple v. Baby Girl, 398 S.C. 625, 731 S.E.2d 550, 555-56 (2012) (Adoptive Couple) (indicating that the trial took place from September 12-15, 2011, when Baby Girl was roughly two years old), reh'g denied, (Aug. 22, 2012), cert. granted, - U.S. -, 133 S.Ct. 831, 184 L.Ed.2d 646 (2013), and rev'd, - U.S. -, 133 S.Ct. 2552, 186 L.Ed.2d 729 (2013).

. Adoptive Couple, 731 S.E.2d at 552.

. Id. at 552, 561.

. Baby Girl, 133 S.Ct. at 2556.

. Id. at 2564.

. Id.

. Id.

. Native Vill. of Tununak v. State, OCS, et al., No. $-14670 (Alaska Supreme Court Order, Oct. 7, 2013).

. Doe v. State, Dep't of Pub. Safety, 92 P.3d 398, 404 (Alaska 2004).

. State, Dep't of Health & Soc. Servs., Office of Children's Servs. v. Doherty, 167 P.3d 64, 68-70 (Alaska 2007) (applying de novo review to § 1983 claims as a matter of federal law).

. West v. Buchanan, 981 P.2d 1065, 1066 (Alaska 1999) (quoting Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

. Doe, 92 P.3d at 402.

. 25 U.S.C. § 1915(a) (emphasis added).

. 25 U.S.C. § 1903(F)(iv) (emphasis added).

. Baby Girl, 133 S.Ct. 2552, 2557 (2013).

. Id. at 2564.

. Id.

. Id. at 2565.

. Id.

. Id.

. Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

. See Baby Girl, 133 S.Ct. at 2564-65. The dissent points out that Baby Girl did not consistently use the word "hold" in its summary of the three central holdings in the case; instead, the Court stated:
[Whe hold that 25 U.S.C. § 1912(f) ... does not apply when, as here, the relevant parent never had custody of the child. We further hold that § 1912(d) ... is inapplicable when, as here, the parent abandoned the Indian child before birth and never had custody of the child. Finally, we clarify that § 1915(a) ... does not bar a non-Indian family like Adoptive Couple from adopting an Indian child when no other eligible candidates have sought to adopt the child. We accordingly reverse the South Carolina Supreme Court's judgment and remand for further proceedings.
Id. at 2557 (emphasis added). Contrary to the dissent's argument, we do not agree that the Court's use of the word "clarify" as opposed to "hold" when addressing § 1915(a) "leaves room for states to determine under their own adoption procedures when an eligible candidate has come forward such that the preferences should be applied." Our cases often use the word "clarify" to signal a holding. For example, in Bruce L. v. W.E., 247 P.3d 966, 976 (Alaska 2011), we stated:
At first blush A.B.M. [v. M.H., 651 P.2d 1170 (Alaska 1982)] seems to mandate a reversal of the trial court's determination that Timothy is not an Indian child because the Eberts' concessions to the contrary throughout the proceedings should constitute judicial admissions. But given our subsequent case law defining the limitation of judicial admissions to purely factual matters and our discussion here regarding the nature of membership or eligibility for membership in a tribe, we clarify that the holding of A.B.M. is limited to precluding the adoptive parents from arguing a new position on appeal contrary to a position they had taken in the superior court on an issue not raised to or decided by that court.
{emphasis added) (footnote omitted). See also Griswold v. City of Homer, 252 P.3d 1020, 1027 (Alaska 2011) ("We therefore clarify that where the superior court acts as an intermediate appellate court ... its opinion or decision on appeal is the 'judgment' to which [the applicable appellate rule} refers." (emphasis added)); Husseini v. Husseini, 230 P.3d 682, 688 (Alaska 2010) ("We take this opportunity to elaborate on our holding in [a prior casel.... [Whe clarify that the trial court's decision to order the sale of a marital asset prior to the final property decision must be accompanied by factual findings that demon *174 strate the exceptional circumstances justifying such a sale and that specifically articulate the grounds upon which the order for sale is based." (emphasis added)); Keane v. Local Boundary Comm'n, 893 P.2d 1239, 1249-50 (Alaska 1995) ('[Wle clarify that the test presented in {our prior case], is still applicable ... [and] 'a different rule applies where the party seeking the injunction stands to suffer irreparable harm and where, at the same time, the opposing party can be protected from injury.'" (emphasis added) (citation omitted)).
We conclude that the dissent's "reliance on words, phrases, and quotations" over substantive legal conclusions in this case confuses dicta from the Court's actual holding. Judith M. Stinson, Why Dicta Becomes Holding and Why It Matters, 76 Brook. L.Rev. 219, 222 (2010). The Supreme Court, as the ultimate arbiter of federal law, has counseled that "unless we wish anarchy to prevail within the ... judicial system, a precedent of this Court must be followed by the lower ... courts [on issues of federal law] no matter how misguided the judges of those courts may think it to be." Hutto v. Davis, 454 U.S. 370, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982). Baby Girl compels today's result.

. Adoptive Couple v. Baby Girl, 404 S.C. 483, 746 S.E.2d 51, 52-53 (2013) (footnote and citation omitted) (emphasis added), petitions for reh'g denied, 404 S.C. 490, 746 S.E.2d 346 (2013), stay denied, - U.S. -, 134 S.Ct. 32, - L.Ed.2d - (2013).

. 490 U.S. 30, 34, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989).

, Id. at 49-51, 109 S.Ct. 1597 (discussing how Congress subjects non-Indian family placements ° of young Indian children to ICWA's "jurisdictional and other provisions, even in cases where the parents consented to an adoption, because of concerns going beyond the wishes of individual parents" (emphasis added)).

. Id. at 37, 109 S.Ct. 1597. In Holyfield a petition for adoption was filed for twin babies whose parents were enrolled members of the Mississippi Band of Choctaw Indians and residents and domiciliaries of the tribal reservation in Mississippi. Id. The twins were born 200 miles from the reservation, and the parents executed consent-to-adoption forms leading to the adoption of the children by non-Indian adoptive parents. Id. at 37-38, 109 S.Ct. 1597. The tribe moved to vacate and set aside the decree of adoption. Id. at 38, 109 S.Ct. 1597. The Supreme Court held the children were "domiciled" on the reservation within the meaning of ICWA's exclusive tribal jurisdiction provision even though they were never physically present on the reservation themselves, and the trial court was *175 without jurisdiction to enter the adoption decree even though the children were "voluntarily surrendered" for adoption. Id. at 48-51, 109 S.Ct. 1597.

. Id. at 49, 109 S.Ct. 1597.

. Id. at 51, 109 S.Ct. 1597.

. Totemoff v. State, 905 P.2d 954, 963 (Alaska 1995) (citing In re F.P., 843 P.2d 1214, 1215 n. 1 (Alaska 1992)).

. McCaffery v. Green, 931 P.2d 407, 415 (Alaska 1997) (Rabinowitz, J., dissenting) (quoting 1B James W. Moore et ar, Moore's Practice § 0.402[1], at 1-10 (2d ed.1996)) (internal quotation marks omitted).

. Tununak I, 303 P.3d 431, 433 (Alaska 2013).

. Id. at 433-34.

. Id. at 434.

. I4.

. Id.

. Id.

. See id. at 435.

. Id. at 435, 437-38.

. Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 309 P.3d 850, 856 (Alaska 2013).

. Baby Girl, 133 S.Ct. 2552, 2558-59 (2013).

. Id. at 2559.

. Id.

. Id. at 2564 (emphasis in original).

. Id. at 2565 ("Nor do § 1915(a)'s rebuttable adoption preferences apply when no alternative party has formally sought to adopt the child.").

. Id. at 2564.

. Id. at 2565.

. CINA Rule 8(c)(7).

. Baby Girl, 133 S.Ct. at 2564.

. See Curisting P. Costantakos, JuventLe Court Law & Practice § 13:12 (2013).

. Id. (emphasis added).

. Tununak I, 303 P.3d 431, 450 (Alaska 2013).

. D.J. v. P.C., 36 P.3d 663, 677 (Alaska 2001) (internal quotation marks omitted) (citing 25 U.S.C. § 1902).

. Tununak I, 303 P.3d at 441-42 (citing Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 37, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989)).
Additionally, as the dissent acknowledges, § 1915(e) requires OCS to document its "efforts to comply with the order of preference specified in [§ 1915(a)]" when such a placement is made following a properly filed petition. We expect that the superior court will carefully and actively scrutinize OCS's efforts in identifying potential adoptive placements and complying with its obligations under § 1915(a) and our case law.