NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KELLY C., | ) | |
| | ) | Supreme Court No. S-15923 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-14-00206 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 1566 – January 20, 2016 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Sharon Barr, Assistant Public Defender, and Quinlan G. Steiner, Public Defender, Anchorage, for Appellant. Janell Hafner, Assistant Attorney General, and Craig W. Richards, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Fabe, Winfree, and Bolger, Justices. [Maassen, Justice, not participating.]

## I. INTRODUCTION

The Office of Children's Services (OCS) removed a medically fragile four-year-old Indian child from her mother's care. The maternal grandparents, an Indian

---

\* Entered under Alaska Appellate Rule 214.

Child Welfare Act (ICWA) preferred placement, requested the child be placed in their home. OCS denied the placement request, explaining that the grandparents had exhibited diminished protective capacities. The grandparents sought review of the placement decision, and the superior court found that "[t]he maternal grandparents are not appropriate or safe for placement of the child." The mother appeals the superior court's decision, arguing that the superior court erred "in finding good cause to . . . deviate from ICWA's placement preferences."

Because the superior court's finding that the grandparents were not a safe placement was not clearly erroneous, we affirm the superior court's decision to deny their placement request.

## II. FACTS AND PROCEEDINGS

### A. Facts[1]

Caitlin C., born August 2, 2011, is Kelly C.'s four-year-old daughter.[2] Kelly is an enrolled member of the Native Village of Diomede, and Caitlin is an Indian Child as defined by ICWA.[3] Abe C. and Suzanne P. are Caitlin's maternal grandparents.

#### 1. Caitlin's birth and medical conditions

Caitlin was born at 25 weeks and 3 days gestation, weighed two and one-half pounds at birth, and is medically fragile. Caitlin remained in the hospital for the first three months after she was born, and for the next seven months Kelly and Caitlin lived

---

[1]     Pseudonyms have been used to protect the privacy of the parties.

[2]     OCS has been unable to locate or directly communicate with Caitlin C.'s father, and he did not participate in the trial court proceedings.

[3]     *See* 25 U.S.C. § 1903(4) (2012) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

in Anchorage with Abe and Suzanne. Caitlin is a special needs child and requires constant medical attention[4] as well as special medical equipment: Caitlin has needed oxygen, a pulse oximeter to measure oxygen levels, and a nebulizer to administer medication.

### 2. OCS involvement

OCS first received a report of harm in 2011, when Caitlin was two weeks old and still in the hospital.[5] OCS did not substantiate the allegation that Caitlin was a "victim[] of child abuse or neglect," and the report did not result in removal. In 2012 OCS again received a report of medical neglect. Like the first report, OCS did not substantiate this report.

In late June 2012 OCS established a protective action plan for Caitlin after getting reports that Caitlin was not receiving her medication, oxygen, or adequate care. The plan provided that Kelly's parents, Abe and Suzanne, would care for Caitlin. The plan noted that Suzanne was a certified nursing assistant and had cared for Caitlin in the past. Caitlin was not removed from Kelly's physical care. Instead, Kelly and Caitlin stayed with Abe and Suzanne until the protective order expired.

Eleven months later, police stopped Kelly's vehicle while investigating a reported drug transaction. Caitlin was also in the vehicle.[6] Police searched Kelly's vehicle and purse, finding two cell phones, over $1,000 in cash, 15.1 grams of heroin,

---

[4] Caitlin had severe hearing issues, visible tooth decay and bottle-rot, a swallowing disorder, eating issues, chronic lung disease, breathing issues, oxygen dependency, and developmental delays.

[5] OCS received a report that Kelly tested positive for methamphetamine when Caitlin was born.

[6] Kelly admits that Caitlin was in her vehicle when she was stopped, but denies that there were drugs in her vehicle.

5.1 grams of crystal methamphetamine, hydrocodone pills, methadone pills, clear plastic bags, used needle syringes, gift cards, a digital scale, a meth pipe, and other drug paraphernalia. The police found no drugs on Caitlin's person, and they dropped the case against Kelly because they did not have reasonable suspicion to justify the stop. Based on this incident, OCS substantiated findings of Kelly's substance abuse.[7] But OCS did not remove Caitlin or contact Kelly after the incident.

### 3. OCS removes Caitlin

On December 1, 2014, Caitlin was present during a home invasion and shooting at Kelly's Wasilla residence. Kelly's former boyfriend shot someone in the home. A subsequent trooper investigation of the home revealed drug paraphernalia in every room, but no drugs. Kelly did not face charges as a result of the shooting.

OCS decided to remove Caitlin because of concerns about parental drug abuse and because of Caitlin's medical needs and vulnerability. OCS could not locate Caitlin immediately after the shooting. Abe explained that after the shooting he and Suzanne also had difficulty locating Kelly and Caitlin because Kelly did not have her phone. Abe stated that it was "a while before [he] actually [saw] her and the baby after the home invasion."

At some point after the shooting, Kelly brought Caitlin to Abe and Suzanne's home because she did not feel safe in her apartment. The exact date that Kelly left Caitlin at her parents' home is unclear: Kelly testified Caitlin had been at her parents' home for "[a] few days" before OCS removed Caitlin on December 12.

---

[7] After Caitlin's removal Kelly did not comply with OCS requests for a hair follicle test and urinalysis.

According to OCS, Abe had stated that Caitlin was living in her grandparents' home for at least a week when she was removed. Abe noted that Caitlin was in his home on December 9, but he did not explain whether Caitlin arrived before that date.

OCS caseworker Ryan Jackson asserted that he spoke with Suzanne on December 4, 8, and 11. Jackson noted that on December 8 Suzanne stated that she was shopping and on December 11 Suzanne stated that Caitlin was safe and offered to call Jackson back and provide a phone number for Kelly. According to Suzanne, when OCS first called she informed OCS that she did not know Caitlin's whereabouts "because I was at work." Suzanne testified that she received a call from OCS in the morning on December 8, and that Caitlin arrived at her home that afternoon. Suzanne asserted that a few days later she told OCS that Caitlin was staying in her home. But according to Jackson, Suzanne never revealed that Caitlin was in her home and never called Jackson back.

OCS suspected that Suzanne had not been forthcoming. OCS believed that Caitlin was in Abe and Suzanne's home and sent a caseworker to investigate on December 12. Abe and Suzanne did not initially release Caitlin to OCS, and they requested that OCS return with the police. OCS ultimately needed to get a writ of assistance before removing Caitlin. Suzanne explained that when OCS first came to her home she would not let them take Caitlin because she was in the middle of giving Caitlin a bath. OCS, with police assistance, removed Caitlin from the home later that day.

When removing Caitlin, Jackson requested her medication and medical equipment. Suzanne provided OCS the medication to use in Caitlin's nebulizer, but not the nebulizer. Suzanne testified that she did not let OCS take the nebulizer or any

oxygen because the equipment in her home belonged to Abe.[8] Suzanne asserted that she understood Caitlin's medical needs, and had Caitlin's medications at her home, but nonetheless let OCS take Caitlin without a nebulizer because OCS "took her without doing [its] homework."[9] Suzanne also testified that she had a device for administering oxygen to Caitlin, but she did not provide the device to OCS.[10] Jackson explained that he did not know the extent of Caitlin's medications and devices, and that the grandparents did not tell him that Caitlin required a nebulizer.

### 4. Placement in a foster home

After removal, Jackson took Caitlin directly to the emergency room because she was breathing heavily and it sounded like she was choking. Caitlin remained in the emergency room for two to three hours. Jackson explained that the attending doctor thought all of Caitlin's teeth would require extraction because her tooth decay was so bad. Jackson also learned that Caitlin's oxygen needed to be monitored at all times and the emergency room refused to release Caitlin without equipment to monitor her oxygen.

Abe and Suzanne requested to have Caitlin placed in their home. Caitlin was instead placed in a non-relative foster home: OCS chose the foster placement

---

[8] Kelly similarly testified that Caitlin's nebulizer and pulse oximeter were in Wasilla. Kelly explained that Abe had oxygen and a nebulizer because he has chronic obstructive pulmonary disease, and she noted that Caitlin used Abe's nebulizer when in Anchorage.

[9] Suzanne immediately attempted to retract her statement: "Oops, I didn't mean it like that. Excuse me."

[10] Kelly also testified that Abe and Suzanne had Caitlin's oxygen concentrator.

because of the placement's experience with special needs children. OCS explained that it was not aware of any Indian foster homes with the necessary background to care for Caitlin.

Sarah S., Caitlin's foster mother,[11] testified that when she picked Caitlin up from the emergency room Caitlin reeked of smoke, had gray circles under her eyes, had prune-like lips, and was very tired.[12] Caitlin's four front teeth were in terrible shape: The insides of her teeth were green and black. According to Sarah, Caitlin was dehydrated with very dry stool and limited urine. She noted that Caitlin arrived with some medication but without her oxygen, nebulizer, or pulse oximeter. On the night Caitlin arrived in her home Sarah stayed up the entire night and repositioned Caitlin's head whenever her oxygen levels dropped.

Sarah explained that she provides a special needs foster home and has experience with special needs children. Sarah asserted that she was trying to learn sign language, and she planned to take Caitlin for a hearing assessment. According to Sarah, Caitlin started showing positive changes within a few days of coming into the home.

## B.    Proceedings

After removal OCS filed an emergency petition for adjudication of Caitlin as a child in need of aid (CINA). A master found probable cause that Caitlin was a CINA and that it would be contrary to her welfare to return to Kelly's home.

---

[11]     Sarah is not Alaska Native and is not related to Caitlin.

[12]     Sarah testified that it took three extensive baths to remove the smell of smoke. Abe asserted that he and Suzanne did not smoke and that he had quit months before Kelly had brought Caitlin to his home. Kelly testified that she smokes, but her home was smoke free and she wears a smokers jacket.

On the same day as the probable cause hearing, OCS denied the grandparents' placement request. The guardian ad litem supported OCS's decision. OCS denied placement with Abe and Suzanne due to "diminished protective capacities."

Abe and Suzanne requested a hearing to review the placement denial. The superior court held two placement review hearings: one on March 17, 2015 and a second on April 2, 2015.[13] Abe and Suzanne testified at the first hearing.

Abe explained that he had requested placement the day OCS removed Caitlin. According to Abe, Caitlin had known him since birth and was bonded to him, and he and Suzanne were capable of providing Caitlin "a safe and loving home."

Abe recognized Caitlin's medical needs and her need for supervision. He noted Caitlin's breathing issues, hearing issues, dental issues, need for oxygen, and swallowing issues. Abe testified that he and Suzanne tried to help Caitlin transition to solid foods and that he sat near Caitlin when she ate to assist her if she began choking. Abe also explained that he planned to teach Caitlin sign language. Abe testified that he and Suzanne did not receive any medication when Caitlin was brought to his home after the shooting, and Abe was under the impression that Caitlin did not have or need oxygen at the time.

Finally, Abe asserted that he was capable of working with OCS if Caitlin was placed in his home. He explained that no one from OCS spoke to him after the home invasion until the day they removed Caitlin from his home. Abe knew that Suzanne had spoken to OCS, but he did not know whether she had told OCS that Caitlin

---

[13] The superior court held two hearings because it did not apply ICWA at the first hearing but subsequently determined that Caitlin is an Indian child.

was not in his home. He testified that when OCS came to his home on December 12, "[w]e cooperated fully." He also noted that OCS had not inspected his home since removing Caitlin.

Suzanne testified that she was aware of Caitlin's medical needs and equipment, including her need for oxygen at night and her portable oxygen dispenser. Suzanne testified that while Caitlin was in her home, she provided Caitlin with oxygen but did not have her hooked up to a monitor to track oxygen levels.

Jackson also testified. Jackson recognized that OCS had temporarily placed Caitlin with Abe and Suzanne in 2012. After removing Caitlin, OCS interviewed Abe as a potential placement. Jackson noted that Abe and Suzanne were cooperative at the time of removal, and that Abe had been easy to deal with, but Jackson explained that OCS denied their placement request because they had lied to OCS, OCS needed police assistance to remove Caitlin, and Abe and Suzanne did not have an oxygen monitor despite a medical recommendation to monitor Caitlin's oxygen around the clock. Jackson also noted that Suzanne had Caitlin's oxygen equipment and chose not to provide it to OCS, and that Suzanne did not tell OCS about Caitlin's nebulizer. Jackson finally referred to Caitlin's condition at the time of removal, explaining that he initially hoped to place Caitlin with her grandparents "[b]ut [could not] the more [he] found out about her medical conditions and what was going on."

The superior court found that OCS "met its burden of clear and convincing evidence that the grandparents are not an appropriate placement." The court noted that the grandparents frustrated OCS's ability to get Caitlin medical attention "because they were not truthful about where she was." The court recognized that the grandparents could only do so much without "a legal basis to get her care," but the court faulted the grandparents for their "fail[ure] to provide OCS with that equipment and that knowledge and that information [which are necessary] to prevent any future harm." The court was

seriously concerned with Suzanne's attitude regarding her failure to provide OCS information and equipment necessary for Caitlin's care: The court described Suzanne's attitude as "that's kind of what they get when they take her" and noted that "[Caitlin's] best interests are not met with that attitude."

At the second placement review hearing, an OCS nurse noted serious concerns about placement with Suzanne and Abe, explaining that the failure to monitor Caitlin's oxygen was extremely dangerous. The nurse explained that she was unaware of any ICWA compliant foster placement that had the medical expertise necessary to deal with Caitlin's needs.

OCS caseworker Cynthia Robinson noted that the current foster mother is not Alaska Native or American Indian and that she did not investigate Suzanne and Abe or Kelly's sister as potential ICWA compliant placements.

The superior court again concluded that Abe and Suzanne were not an appropriate placement because of their attitude and failure to give Caitlin's medical equipment to OCS. The court found that it would not be safe to return Caitlin to Abe and Suzanne's care. And in a written order the court wrote: "The maternal grandparents are not appropriate or safe for placement of the child." Finally, the court recognized ICWA's preferred foster placements and encouraged OCS to expeditiously search for an ICWA preferred placement.

## III. STANDARD OF REVIEW

"We review the superior court's finding of good cause to deviate from ICWA adoptive placement preferences for an abuse of discretion. 'It would be an abuse of discretion for a superior court to consider improper factors or improperly weigh

certain factors in making its determination.' "[14] Any "factual findings supporting the superior court's good cause determination [are reviewed] for clear error."[15] And "[d]etermining whether the superior court's findings comply with ICWA requirements is a question of law that we review de novo."[16]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err In Finding That The Grandparents Are Not A Suitable Placement.

"ICWA specifies preferred adoptive [and foster] placements for Indian children."[17] ICWA provides:

> Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with–
>
> > (i) a member of the Indian child's extended family;
> >
> > (ii) a foster home licensed, approved, or specified by the Indian child's tribe;

---

[14] *Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.* (*Tununak I*), 303 P.3d 431, 440 (Alaska 2013) (footnote omitted) (quoting *In re Adoption of Sara J.*, 123 P.3d 1017, 1021 (Alaska 2005)), *rev'd on other grounds*, *Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.* (*Tununak II*), 334 P.3d 165, 167-68 (Alaska 2014).

[15] *Id.* (citing *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994)).

[16] *Id.* (citing *In re Sara J.*, 123 P.3d at 1021).

[17] *In re Sara J.*, 123 P.3d at 1021.

> (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
>
> (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.[18]

And ICWA further provides:

> The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties.[19]

Thus, "[o]nly for 'good cause' may a state deviate from the . . . preferred placements."[20]

In 1979 the Bureau of Indian Affairs (BIA) published "Guidelines for State Courts; Indian Child Custody Proceedings."[21] The guidelines provided examples of good cause to deviate from ICWA's preferred placements:

> (a) For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference set out above shall be based on one or more of the following considerations:
>
> (i) The request of the biological parents or the child when the child is of sufficient age.
>
> (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

---

[18]     25 U.S.C. § 1915(b) (2012).

[19]     *Id.* § 1915(d).

[20]     *In re Sara J.*, 123 P.3d at 1021.

[21]     44 Fed. Reg. 67,584 (Nov. 26, 1979).

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.[22]

We have explained that "[t]he guidelines assist but do not bind this court."[23]

In *In re Adoption of Sara J.* we distinguished "inquiries into suitab[ility of] preferred placements" from "inquiries into good cause."[24] After reviewing ICWA's text, its legislative history, case law from other states, and the BIA guidelines, we concluded that the prevailing cultural and social standards of the Indian community apply to suitability inquiries but they do not generally apply to good cause inquiries.[25] And in *Tununak I*, we discussed *In re Adoption of Sara J.* and explained that "before determining whether good cause exists to deviate from the placement preferences, a court must first inquire as to whether any suitable preferred placements exists."[26] We

---

[22]     *Id*. at 67,594.

[23]     *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994).

[24]     122 P.3d at 1023. We stated: "Congress appears to have intended that questions of the need for non-Native placements be conceptually separate from disputes about whether a preferred placement is suitable." *Id*.

[25]     *Id*. at 1021-29. We recognized that "the superior court may refer to the prevailing social and cultural standards of the Indian community in determining whether a child's special needs or other circumstances are sufficient to establish good cause to deviate from [ICWA's] placement preferences." *Id*. at 1022. We also concluded that ICWA "demonstrates a congressional intent to apply the prevailing social and cultural standards of the Indian community to determinations of suitability of potential preferred placements, but not to determinations of good cause to deviate from the preferences." *Id*. at 1024.

[26]     303 P.3d 431, 450 (Alaska 2013), *rev'd on other grounds*, *Tununak II*, 334 P.3d 165, 167-68 (Alaska 2014). We stated: "In other words, the [trial] court must determine not only that a placement is preferred, but also that the placement would be
(continued...)

"recognize[d] that, although separate inquiries, the suitability and good cause determinations will often overlap and can rarely be considered independent of one another."[27]

In February 2015 the BIA adopted new "Guidelines for State Courts and Agencies in Indian Child Custody Proceedings."[28] The updated guidelines "supersede and replace the guidelines published in 1979."[29] The updated guidelines also address good cause to deviate from ICWA placement preferences and, consistent with our suitability analysis, they encourage state courts to consider whether a potential placement "meets the physical, mental and emotional needs of the child."[30]

Kelly argues that the superior court erred "in denying placement with the maternal grandparents" because "there was not good cause to deviate from the ICWA placement preferences." Kelly's argument on appeal focuses on the superior court's conclusion that her parents were not a safe placement. The superior court upheld OCS's decision to deny Abe and Suzanne's placement request after concluding that they were unsafe, i.e., an unsuitable or unavailable placement. Thus, we must determine whether the superior court clearly erred in finding by clear and convincing evidence that the grandparents were not a suitable placement.

Kelly correctly notes that the superior court's decision to deny her parents' placement request focused "on the events surrounding the December 12, 2014 removal."

---

[26]    (...continued)
a suitable caretaker for the child."  *Id.*

[27]    *Id.*

[28]    80 Fed. Reg 10,146 (Feb. 25, 2015).

[29]    *Id.* at 10,147.

[30]    *Id.* at 10,158.

Kelly recognizes that the court concluded that her parents had been untruthful, but Kelly points out that Abe never spoke to OCS and that her parents were cooperative during Caitlin's removal. Kelly also argues that the court erroneously faulted Abe and Suzanne for failing to provide Caitlin's medical equipment at the time of removal because they did not have legal custody of Caitlin and did not have all of her equipment in their possession. Kelly finally argues that "[w]hatever problems may have occurred surrounding the removal were outweighed by the reasons to place Caitlin with her grandparents."

Evidence in the record supports the superior court's finding that Abe and Suzanne were unsafe and not a suitable placement.[31] Kelly does not dispute that Suzanne was not honest about Caitlin's whereabouts, and the superior court found that this dishonesty frustrated OCS's ability to provide necessary care. And both Abe and Suzanne testified that they understood Caitlin's extensive medical needs. Yet they were not monitoring her oxygen at night, they did not provide OCS all of the medical equipment that was in their possession, and when OCS removed Caitlin they did not convey the extent of Caitlin's immediate medical needs. Finally, Suzanne exhibited no concern for Caitlin's health when asserting that OCS took her without doing its homework.

The superior court's finding that the grandparents were an unsafe placement is supported by substantial evidence in the record. We therefore affirm the superior court's decision to deny placement with Abe and Suzanne.

---

[31] Consistent with our decision in *Tununak I*, the superior court applied the clear and convincing evidence standard of proof. *See* 303 P.3d at 446-49 & 450 n.94 (explaining that clear and convincing standard of proof applies to the good cause determination and discerning "no principled basis for adopting inconsistent standards of proof for the good cause determination and the suitability determination").

**B.      There Is No Reason To Remand This Case.**

OCS asserts that "while reversal is not an appropriate remedy, OCS would not oppose a limited remand of this appeal for further factual development and, potentially, a new hearing on the placement question." Kelly responds that if we remand, we should establish an expedited time frame to prevent unnecessary delay in this appeal. Neither party presents an adequate reason to remand this case.

OCS correctly notes that a child's and a potential placement's circumstances change over time. OCS points to evidence in the record that Caitlin's condition had improved after OCS took custody, and OCS recognizes that since the date of removal, Abe and Suzanne have not been investigated as a potential placement. OCS finally notes that a remand will provide for exploration of "alternative ICWA placements."

But as explained above, Kelly's current appeal focused on the superior court's decision that her parents were not a safe placement. And this finding was not clearly erroneous. A remand is not necessary because the superior court does not need to reconsider this decision. The superior court recognized OCS's obligation to diligently identify ICWA preferred placements, and the court explicitly encouraged OCS to make such efforts.[32] Presumably these efforts will occur without a remand and will include investigations of any potentially suitable preferred placements.

We see no reason to remand this case when the superior court did not err in finding that the grandparents were an unsuitable placement and correctly encouraged OCS to diligently seek ICWA preferred placements.

---

[32]      Guidelines for State Courts in Indian Child Custody Proceedings, 80 Fed. Reg 10,146, 10,158 (Feb. 25, 2015); Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,594 (Nov. 26, 1979).

## V.     CONCLUSION

We AFFIRM the superior court's placement order.